(Slip Opinion) OCTOBER TERM, 2014 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## CITY OF LOS ANGELES, CALIFORNIA *v.* PATEL ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 13–1175. Argued March 3, 2015—Decided June 22, 2015

Petitioner, the city of Los Angeles (City), requires hotel operators to record and keep specific information about their guests on the premises for a 90-day period. Los Angeles Municipal Code §41.49. These records "shall be made available to any officer of the Los Angeles Police Department for inspection . . . at a time and in a manner that minimizes any interference with the operation of the business," §41.49(3)(a), and a hotel operator's failure to make the records available is a criminal misdemeanor, §11.00(m). Respondents, a group of motel operators and a lodging association, brought a facial challenge to §41.49(3)(a) on Fourth Amendment grounds. The District Court entered judgment for the City, finding that respondents lacked a reasonable expectation of privacy in their records. The Ninth Circuit subsequently reversed, determining that inspections under §41.49(3)(a) are Fourth Amendment searches and that such searches are unreasonable under the Fourth Amendment because hotel owners are subjected to punishment for failure to turn over their records without first being afforded the opportunity for precompliance review.

*Held*:

1. Facial challenges under the Fourth Amendment are not categorically barred or especially disfavored. Pp. 4–8.

(a) Facial challenges to statutes—as opposed to challenges to particular applications of statutes—have been permitted to proceed under a diverse array of constitutional provisions. See, *e.g., Sorrell* v. *IMS Health Inc.*, 564 U. S. ___ (First Amendment); *District of Columbia* v. *Heller*, 554 U. S. 570 (Second Amendment). The Fourth Amendment is no exception. *Sibron* v. *New York*, 392 U. S. 40, distinguished. This Court has entertained facial challenges to statutes

authorizing warrantless searches, declaring them, on several occasions, facially invalid, see, *e.g., Chandler* v. *Miller*, 520 U. S. 305, 308–309. Pp. 4–7.

(b) Petitioner contends that facial challenges to statutes authorizing warrantless searches must fail because they will never be unconstitutional in all applications, but this Court's precedents demonstrate that such challenges can be brought, and can succeed. Under the proper facial-challenge analysis, only applications of a statute in which the statute actually authorizes or prohibits conduct are considered. See, *e.g., Planned Parenthood of Southeastern Pa.* v. *Casey*, 505 U. S. 833. When addressing a facial challenge to a statute authorizing warrantless searches, the proper focus is on searches that the law actually authorizes and not those that could proceed irrespective of whether they are authorized by the statute, *e.g.,* where exigent circumstances, a warrant, or consent to search exists. Pp. 7–8.

2. Section 41.49(3)(a) is facially unconstitutional because it fails to provide hotel operators with an opportunity for precompliance review. Pp. 9–17.

(a) " '[S]earches conducted outside the judicial process . . . are *per se* unreasonable under the Fourth Amendment—subject only to a few . . . exceptions.' " *Arizona* v. *Gant*, 556 U. S. 332, 338. One exception is for administrative searches. See *Camara* v. *Municipal Court of City and County of San Francisco*, 387 U. S. 523, 534. To be constitutional, the subject of an administrative search must, among other things, be afforded an opportunity to obtain precompliance review before a neutral decisionmaker. See *See* v. *Seattle*, 387 U. S. 541, 545. Assuming the administrative search exception otherwise applies here, §41.49 is facially invalid because it fails to afford hotel operators any opportunity for precompliance review. To be clear, a hotel owner must only be afforded an opportunity for precompliance review; actual review need occur only when a hotel operator objects to turning over the records. This opportunity can be provided without imposing onerous burdens on law enforcement. For instance, officers in the field can issue administrative subpoenas without probable cause that a regulation is being infringed. This narrow holding does not call into question those parts of §41.49 requiring hotel operators to keep records nor does it prevent police from obtaining access to those records where a hotel operator consents to the search, where the officer has a proper administrative warrant, or where some other exception to the warrant requirement applies. Pp. 9–13.

(b) Petitioner's argument that the ordinance is facially valid under the more relaxed standard for closely regulated industries is rejected. See *Marshall* v. *Barlow's, Inc.*, 436 U. S. 307, 313. This Court has only recognized four such industries, and nothing inherent in the

Syllabus

operation of hotels poses a comparable clear and significant risk to the public welfare. Additionally, because the majority of regulations applicable to hotels apply to many businesses, to classify hotels as closely regulated would permit what has always been a narrow exception to swallow the rule. But even if hotels were closely regulated, §41.49 would still contravene the Fourth Amendment as it fails to satisfy the additional criteria that must be met for searches of closely regulated industries to be reasonable. See *New York* v. *Burger*, 482 U. S. 691, 702–703. Pp. 13–17.

738 F. 3d 1058, affirmed.

SOTOMAYOR, J., delivered the opinion of the Court, in which KENNEDY, GINSBURG, BREYER, and KAGAN, JJ., joined. SCALIA, J., filed a dissenting opinion, in which ROBERTS, C. J., and THOMAS, J., joined. ALITO, J., filed a dissenting opinion, in which THOMAS, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 13–1175

_____

## CITY OF LOS ANGELES, CALIFORNIA, PETITIONER *v.* NARANJIBHAI PATEL, ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 22, 2015]

JUSTICE SOTOMAYOR delivered the opinion of the Court.

Respondents brought a Fourth Amendment challenge to a provision of the Los Angeles Municipal Code that compels "[e]very operator of a hotel to keep a record" containing specified information concerning guests and to make this record "available to any officer of the Los Angeles Police Department for inspection" on demand. Los Angeles Municipal Code §§41.49(2), (3)(a), (4) (2015). The questions presented are whether facial challenges to statutes can be brought under the Fourth Amendment and, if so, whether this provision of the Los Angeles Municipal Code is facially invalid. We hold facial challenges can be brought under the Fourth Amendment. We further hold that the provision of the Los Angeles Municipal Code that requires hotel operators to make their registries available to the police on demand is facially unconstitutional because it penalizes them for declining to turn over their records without affording them any opportunity for precompliance review.

## I
## A

Los Angeles Municipal Code (LAMC) §41.49 requires hotel operators to record information about their guests, including: the guest's name and address; the number of people in each guest's party; the make, model, and license plate number of any guest's vehicle parked on hotel property; the guest's date and time of arrival and scheduled departure date; the room number assigned to the guest; the rate charged and amount collected for the room; and the method of payment. §41.49(2). Guests without reservations, those who pay for their rooms with cash, and any guests who rent a room for less than 12 hours must present photographic identification at the time of check-in, and hotel operators are required to record the number and expiration date of that document. §41.49(4). For those guests who check in using an electronic kiosk, the hotel's records must also contain the guest's credit card information. §41.49(2)(b). This information can be maintained in either electronic or paper form, but it must be "kept on the hotel premises in the guest reception or guest check-in area or in an office adjacent" thereto for a period of 90 days. §41.49(3)(a).

Section 41.49(3)(a)—the only provision at issue here—states, in pertinent part, that hotel guest records "shall be made available to any officer of the Los Angeles Police Department for inspection," provided that "[w]henever possible, the inspection shall be conducted at a time and in a manner that minimizes any interference with the operation of the business." A hotel operator's failure to make his or her guest records available for police inspection is a misdemeanor punishable by up to six months in jail and a $1,000 fine. §11.00(m) (general provision applicable to entire LAMC).

### B

In 2003, respondents, a group of motel operators along with a lodging association, sued the city of Los Angeles (City or petitioner) in three consolidated cases challenging the constitutionality of §41.49(3)(a). They sought declaratory and injunctive relief. The parties "agree[d] that the sole issue in the . . . action [would be] a facial constitutional challenge" to §41.49(3)(a) under the Fourth Amendment. App. 195. They further stipulated that respondents have been subjected to mandatory record inspections under the ordinance without consent or a warrant. *Id.,* at 194–195.

Following a bench trial, the District Court entered judgment in favor of the City, holding that respondents' facial challenge failed because they lacked a reasonable expectation of privacy in the records subject to inspection. A divided panel of the Ninth Circuit affirmed on the same grounds. 686 F. 3d 1085 (2012). On rehearing en banc, however, the Court of Appeals reversed. 738 F. 3d 1058, 1065 (2013).

The en banc court first determined that a police officer's nonconsensual inspection of hotel records under §41.49 is a Fourth Amendment "search" because "[t]he business records covered by §41.49 are the hotel's private property" and the hotel therefore "has the right to exclude others from prying into the[ir] contents." *Id.,* at 1061. Next, the court assessed "whether the searches authorized by §41.49 are reasonable." *Id.,* at 1063. Relying on *Donovan* v. *Lone Steer, Inc.*, 464 U. S. 408 (1984), and *See* v. *Seattle*, 387 U. S. 541 (1967), the court held that §41.49 is facially unconstitutional "as it authorizes inspections" of hotel records "without affording an opportunity to 'obtain judicial review of the reasonableness of the demand prior to suffering penalties for refusing to comply.'" 738 F. 3d, at 1065 (quoting *See*, 387 U. S., at 545).

Two dissenting opinions were filed. The first dissent

argued that facial relief should rarely be available for Fourth Amendment challenges, and was inappropriate here because the ordinance would be constitutional in those circumstances where police officers demand access to hotel records with a warrant in hand or exigent circumstances justify the search. 738 F. 3d, at 1065–1070 (opinion of Tallman, J.). The second dissent conceded that inspections under §41.49 constitute Fourth Amendment searches, but faulted the majority for assessing the reasonableness of these searches without accounting for the weakness of the hotel operators' privacy interest in the content of their guest registries. *Id.,* at 1070–1074 (opinion of Clifton, J.).

We granted certiorari, 574 U. S. ___ (2014), and now affirm.

## II

We first clarify that facial challenges under the Fourth Amendment are not categorically barred or especially disfavored.

## A

A facial challenge is an attack on a statute itself as opposed to a particular application. While such challenges are "the most difficult . . . to mount successfully," *United States* v. *Salerno*, 481 U. S. 739, 745 (1987), the Court has have never held that these claims cannot be brought under any otherwise enforceable provision of the Constitution. Cf. Fallon, Fact and Fiction About Facial Challenges, 99 Cal. L. Rev. 915, 918 (2011) (pointing to several Terms in which "the Court adjudicated more facial challenges on the merits than it did as-applied challenges"). Instead, the Court has allowed such challenges to proceed under a diverse array of constitutional provisions. See, *e.g., Sorrell* v. *IMS Health Inc.*, 564 U. S. ___ (2011) (First Amendment); *District of Columbia* v. *Heller*, 554 U. S. 570

(2008) (Second Amendment); *Chicago* v. *Morales*, 527 U. S. 41 (1999) (Due Process Clause of the Fourteenth Amendment); *Kraft Gen. Foods, Inc.* v. *Iowa Dept. of Revenue and Finance*, 505 U. S. 71 (1992) (Foreign Commerce Clause).

Fourth Amendment challenges to statutes authorizing warrantless searches are no exception. Any claim to the contrary reflects a misunderstanding of our decision in *Sibron* v. *New York*, 392 U. S. 40 (1968). In *Sibron*, two criminal defendants challenged the constitutionality of a statute authorizing police to, among other things, "'stop any person abroad in a public place whom [they] reasonably suspec[t] is committing, has committed or is about to commit a felony." *Id.,* at 43 (quoting then N. Y. Code Crim. Proc. §180–a). The Court held that the search of one of the defendants under the statute violated the Fourth Amendment, 392 U. S., at 59, 62, but refused to opine more broadly on the statute's validity, stating that "[t]he constitutional validity of a warrantless search is pre-eminently the sort of question which can only be decided in the concrete factual context of the individual case." *Id.,* at 59.

This statement from *Sibron*—which on its face might suggest an intent to foreclose all facial challenges to statutes authorizing warrantless searches—must be understood in the broader context of that case. In the same section of the opinion, the Court emphasized that the "operative categories" of the New York law at issue were "susceptible of a wide variety of interpretations," *id.,* at 60, and that "[the law] was passed too recently for the State's highest court to have ruled upon many of the questions involving potential intersections with federal constitutional guarantees," *id.,* at 60, n. 20. *Sibron* thus stands for the simple proposition that claims for facial relief under the Fourth Amendment are unlikely to succeed when there is substantial ambiguity as to what conduct a statute authorizes: Where a statute consists of "extraordinarily

elastic categories," it may be "impossible to tell" whether and to what extent it deviates from the requirements of the Fourth Amendment. *Id.,* at 59, 61, n. 20.

This reading of *Sibron* is confirmed by subsequent precedents. Since *Sibron*, the Court has entertained facial challenges under the Fourth Amendment to statutes authorizing warrantless searches. See, *e.g., Vernonia School District 47J* v. *Acton*, 515 U. S. 646, 648 (1995) ("We granted certiorari to decide whether" petitioner's student athlete drug testing policy "violates the Fourth and Fourteenth Amendments to the United States Constitution"); *Skinner* v. *Railway Labor Executives' Assn.*, 489 U. S. 602, 633, n. 10 (1989) ("[R]espondents have challenged the administrative scheme on its face. We deal therefore with whether the [drug] tests contemplated by the regulation can *ever* be conducted"); cf. *Illinois* v. *Krull*, 480 U. S. 340, 354 (1987) ("[A] person subject to a statute authorizing searches without a warrant or probable cause may bring an action seeking a declaration that the statute is unconstitutional and an injunction barring its implementation"). Perhaps more importantly, the Court has on numerous occasions declared statutes facially invalid under the Fourth Amendment. For instance, in *Chandler* v. *Miller*, 520 U. S. 305, 308–309 (1997), the Court struck down a Georgia statute requiring candidates for certain state offices to take and pass a drug test, concluding that this "requirement . . . [did] not fit within the closely guarded category of constitutionally permissible suspicionless searches." Similar examples abound. See, *e.g., Ferguson* v. *Charleston*, 532 U. S. 67, 86 (2001) (holding that a hospital policy authorizing "nonconsensual, warrantless, and suspicionless searches" contravened the Fourth Amendment); *Payton* v. *New York*, 445 U. S. 573, 574, 576 (1980) (holding that a New York statute "authoriz[ing] police officers to enter a private residence without a warrant and with force, if necessary, to make a routine felony

arrest" was "not consistent with the Fourth Amendment"); *Torres* v. *Puerto Rico*, 442 U. S. 465, 466, 471 (1979) (holding that a Puerto Rico statute authorizing "police to search the luggage of any person arriving in Puerto Rico from the United States" was unconstitutional because it failed to require either probable cause or a warrant).

#### B

Petitioner principally contends that facial challenges to statutes authorizing warrantless searches must fail because such searches will never be unconstitutional in all applications. Cf. *Salerno*, 481 U. S., at 745 (to obtain facial relief the party seeking it "must establish that no set of circumstances exists under which the [statute] would be valid"). In particular, the City points to situations where police are responding to an emergency, where the subject of the search consents to the intrusion, and where police are acting under a court-ordered warrant. See Brief for Petitioner 19–20. While petitioner frames this argument as an objection to respondents' challenge in this case, its logic would preclude facial relief in every Fourth Amendment challenge to a statute authorizing warrantless searches. For this reason alone, the City's argument must fail: The Court's precedents demonstrate not only that facial challenges to statutes authorizing warrantless searches can be brought, but also that they can succeed. See Part II–A, *supra.*

Moreover, the City's argument misunderstands how courts analyze facial challenges. Under the most exacting standard the Court has prescribed for facial challenges, a plaintiff must establish that a "law is unconstitutional in all of its applications." *Washington State Grange* v. *Washington State Republican Party*, 552 U. S. 442, 449 (2008). But when assessing whether a statute meets this standard, the Court has considered only applications of the

statute in which it actually authorizes or prohibits con-
duct. For instance, in *Planned Parenthood of Southeast-
ern Pa.* v. *Casey*, 505 U. S. 833 (1992), the Court struck
down a provision of Pennsylvania's abortion law that
required a woman to notify her husband before obtaining
an abortion. Those defending the statute argued that
facial relief was inappropriate because most women volun-
tarily notify their husbands about a planned abortion and
for them the law would not impose an undue burden. The
Court rejected this argument, explaining: The
"[l]egislation is measured for consistency with the Consti-
tution by its impact on those whose conduct it affects. . . .
The proper focus of the constitutional inquiry is the group
for whom the law is a restriction, not the group for whom
the law is irrelevant." *Id.,* at 894.

   Similarly, when addressing a facial challenge to a stat-
ute authorizing warrantless searches, the proper focus of
the constitutional inquiry is searches that the law actually
authorizes, not those for which it is irrelevant. If exigency
or a warrant justifies an officer's search, the subject of the
search must permit it to proceed irrespective of whether it
is authorized by statute. Statutes authorizing warrantless
searches also do no work where the subject of a search has
consented. Accordingly, the constitutional "applications"
that petitioner claims prevent facial relief here are irrele-
vant to our analysis because they do not involve actual
applications of the statute.[1]

_____

   [1] Relatedly, the United States claims that a statute authorizing war-
rantless searches may still have independent force if it imposes a
penalty for failing to cooperate in a search conducted under a warrant
or in an exigency. See Brief for United States as *Amicus Curiae* 19.
This argument gets things backwards. An otherwise facially unconsti-
tutional statute cannot be saved from invalidation based solely on the
existence of a penalty provision that applies when searches are not
actually authorized by the statute. This argument is especially uncon-
vincing where, as here, an independent obstruction of justice statute
imposes a penalty for "willfully, resist[ing], delay[ing], or obstruct[ing]

### III

Turning to the merits of the particular claim before us, we hold that §41.49(3)(a) is facially unconstitutional because it fails to provide hotel operators with an opportunity for precompliance review.

### A

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." It further provides that "no Warrants shall issue, but upon probable cause." Based on this constitutional text, the Court has repeatedly held that "'searches conducted outside the judicial process, without prior approval by [a] judge or [a] magistrate [judge], are *per se* unreasonable . . . subject only to a few specifically established and well-delineated exceptions.'" *Arizona* v. *Gant*, 556 U. S. 332, 338 (2009) (quoting *Katz* v. *United States*, 389 U. S. 347, 357 (1967)). This rule "applies to commercial premises as well as to homes." *Marshall* v. *Barlow's, Inc.*, 436 U. S. 307, 312 (1978).

Search regimes where no warrant is ever required may be reasonable where "'special needs . . . make the warrant and probable-cause requirement impracticable,'" *Skinner*, 489 U. S., at 619 (quoting *Griffin* v. *Wisconsin*, 483 U. S. 868, 873 (1987) (some internal quotation marks omitted)), and where the "primary purpose" of the searches is "[d]istinguishable from the general interest in crime control," *Indianapolis* v. *Edmond*, 531 U. S. 32, 44 (2000). Here, we assume that the searches authorized by §41.49 serve a "special need" other than conducting criminal investigations: They ensure compliance with the record-

_____

any public officer . . . in the discharge or attempt to discharge any duty of his or her office of employment." Cal. Penal Code Ann. §148(a)(1) (West 2014).

keeping requirement, which in turn deters criminals from operating on the hotels' premises.[2]  The Court has referred to this kind of search as an "administrative searc[h]." *Camara* v. *Municipal Court of City and County of San Francisco*, 387 U. S. 523, 534 (1967).  Thus, we consider whether §41.49 falls within the administrative search exception to the warrant requirement.

The Court has held that absent consent, exigent circumstances, or the like, in order for an administrative search to be constitutional, the subject of the search must be afforded an opportunity to obtain precompliance review before a neutral decisionmaker.  See *See*, 387 U. S., at 545; *Lone Steer*, 464 U. S., at 415 (noting that an administrative search may proceed with only a subpoena where the subpoenaed party is sufficiently protected by the opportunity to "question the reasonableness of the subpoena, before suffering any penalties for refusing to comply with it, by raising objections in an action in district court").  And, we see no reason why this minimal requirement is inapplicable here.  While the Court has never attempted to prescribe the exact form an opportunity for precompliance review must take, the City does not even attempt to argue that §41.49(3)(a) affords hotel operators any opportunity whatsoever.  Section 41.49(3)(a) is, therefore, facially invalid.

A hotel owner who refuses to give an officer access to his or her registry can be arrested on the spot.  The Court has held that business owners cannot reasonably be put to this kind of choice.  *Camara*, 387 U. S., at 533 (holding that "broad statutory safeguards are no substitute for individualized review, particularly when those safeguards may

————————
[2] Respondents contend that §41.49's principal purpose instead is to facilitate criminal investigation.  Brief for Respondents 44–47.  Because we find that the searches authorized by §41.49 are unconstitutional even if they serve the City's asserted purpose, we decline to address this argument.

only be invoked at the risk of a criminal penalty"). Absent an opportunity for precompliance review, the ordinance creates an intolerable risk that searches authorized by it will exceed statutory limits, or be used as a pretext to harass hotel operators and their guests. Even if a hotel has been searched 10 times a day, every day, for three months, without any violation being found, the operator can only refuse to comply with an officer's demand to turn over the registry at his or her own peril.

To be clear, we hold only that a hotel owner must be afforded an *opportunity* to have a neutral decisionmaker review an officer's demand to search the registry before he or she faces penalties for failing to comply. Actual review need only occur in those rare instances where a hotel operator objects to turning over the registry. Moreover, this opportunity can be provided without imposing onerous burdens on those charged with an administrative scheme's enforcement. For instance, respondents accept that the searches authorized by §41.49(3)(a) would be constitutional if they were performed pursuant to an administrative subpoena. Tr. of Oral Arg. 36–37. These subpoenas, which are typically a simple form, can be issued by the individual seeking the record—here, officers in the field—without probable cause that a regulation is being infringed. See *See*, 387 U. S., at 544 ("[T]he demand to inspect may be issued by the agency"). Issuing a subpoena will usually be the full extent of an officer's burden because "the great majority of businessmen can be expected in normal course to consent to inspection without warrant." *Barlow's, Inc.*, 436 U. S., at 316. Indeed, the City has cited no evidence suggesting that without an ordinance authorizing on-demand searches, hotel operators would regularly refuse to cooperate with the police.

In those instances, however, where a subpoenaed hotel operator believes that an attempted search is motivated by illicit purposes, respondents suggest it would be suffi-

cient if he or she could move to quash the subpoena before any search takes place. Tr. of Oral Arg. 38–39. A neutral decisionmaker, including an administrative law judge, would then review the subpoenaed party's objections before deciding whether the subpoena is enforceable. Given the limited grounds on which a motion to quash can be granted, such challenges will likely be rare. And, in the even rarer event that an officer reasonably suspects that a hotel operator may tamper with the registry while the motion to quash is pending, he or she can guard the registry until the required hearing can occur, which ought not take long. *Riley* v. *California*, 573 U. S. ___ (2014) (slip op., at 12) (police may seize and hold a cell phone "to prevent destruction of evidence while seeking a warrant"); *Illinois* v. *McArthur*, 531 U. S. 326, 334 (2001) (citing cases upholding the constitutionality of "temporary restraints where [they are] needed to preserve evidence until police could obtain a warrant"). Cf. *Missouri* v. *McNeely*, 569 U. S. ___ (2013) (slip op., at 12) (noting that many States have procedures in place for considering warrant applications telephonically).[3]

Procedures along these lines are ubiquitous. A 2002 report by the Department of Justice "identified approximately 335 existing administrative subpoena authorities held by various [federal] executive branch entities." Office of Legal Policy, Report to Congress on the Use of Administrative Subpoena Authorities by Executive Branch Agencies and Entities 3, online at http://www.justice.gov/archive/olp/rpt_to_congress.htm (All Internet materials as visited June 19, 2015, and available in Clerk of Court's case file). Their prevalence

─────────

[3]JUSTICE SCALIA professes to be baffled at the idea that we could suggest that in certain circumstances, police officers may seize something that they cannot immediately search. *Post*, at 10–11 (dissenting opinion). But that is what this Court's cases have explicitly endorsed, including *Riley* just last Term.

confirms what common sense alone would otherwise lead us to conclude: In most contexts, business owners can be afforded at least an opportunity to contest an administrative search's propriety without unduly compromising the government's ability to achieve its regulatory aims.

Of course administrative subpoenas are only one way in which an opportunity for precompliance review can be made available. But whatever the precise form, the availability of precompliance review alters the dynamic between the officer and the hotel to be searched, and reduces the risk that officers will use these administrative searches as a pretext to harass business owners.

Finally, we underscore the narrow nature of our holding. Respondents have not challenged and nothing in our opinion calls into question those parts of §41.49 that require hotel operators to maintain guest registries containing certain information. And, even absent legislative action to create a procedure along the lines discussed above, see *supra,* at 11, police will not be prevented from obtaining access to these documents. As they often do, hotel operators remain free to consent to searches of their registries and police can compel them to turn them over if they have a proper administrative warrant—including one that was issued *ex parte*—or if some other exception to the warrant requirement applies, including exigent circumstances.[4]

## B

Rather than arguing that §41.49(3)(a) is constitutional

---

[4] In suggesting that our holding today will somehow impede law enforcement from achieving its important aims, JUSTICE SCALIA relies on instances where hotels were used as "prisons for migrants smuggled across the border and held for ransom" or as "rendezvous sites where child sex workers meet their clients on threat of violence from their procurers." See *post*, at 2. It is hard to imagine circumstances more exigent than these.

under the general administrative search doctrine, the City and JUSTICE SCALIA contend that hotels are "closely regulated," and that the ordinance is facially valid under the more relaxed standard that applies to searches of this category of businesses. Brief for Petitioner 28–47; *post,* at 5. They are wrong on both counts.

Over the past 45 years, the Court has identified only four industries that "have such a history of government oversight that no reasonable expectation of privacy . . . could exist for a proprietor over the stock of such an enterprise," *Barlow's, Inc.,* 436 U. S., 313. Simply listing these industries refutes petitioner's argument that hotels should be counted among them. Unlike liquor sales, *Colonnade Catering Corp.* v. *United States*, 397 U. S. 72 (1970), firearms dealing, *United States* v. *Biswell*, 406 U. S. 311, 311–312 (1972), mining, *Donovan* v. *Dewey*, 452 U. S. 594 (1981), or running an automobile junkyard, *New York* v. *Burger*, 482 U. S. 691 (1987), nothing inherent in the operation of hotels poses a clear and significant risk to the public welfare. See, *e.g., id.,* at 709 ("Automobile junkyards and vehicle dismantlers provide the major market for stolen vehicles and vehicle parts"); *Dewey*, 452 U. S., at 602 (describing the mining industry as "among the most hazardous in the country").[5]

Moreover, "[t]he clear import of our cases is that the closely regulated industry . . . is the exception." *Barlow's, Inc.*, 436 U. S., at 313. To classify hotels as pervasively regulated would permit what has always been a narrow exception to swallow the rule. The City wisely refrains from arguing that §41.49 itself renders hotels closely regulated. Nor do any of the other regulations on which

───────────

[5] JUSTICE SCALIA's effort to depict hotels as raising a comparable degree of risk rings hollow. See *post*, at 1, 14. Hotels—like practically all commercial premises or services—can be put to use for nefarious ends. But unlike the industries that the Court has found to be closely regulated, hotels are not intrinsically dangerous.

petitioner and JUSTICE SCALIA rely—regulations requiring hotels to, *inter alia*, maintain a license, collect taxes, conspicuously post their rates, and meet certain sanitary standards—establish a comprehensive scheme of regulation that distinguishes hotels from numerous other businesses. See Brief for Petitioner 33–34 (citing regulations); *post*, at 7 (same). All businesses in Los Angeles need a license to operate. LAMC §§21.03(a), 21.09(a). While some regulations apply to a smaller set of businesses, see *e.g.* Cal. Code Regs., tit. 25, §40 (2015) (requiring linens to be changed between rental guests), online at http://www.oal.ca.gov/ccr.htm, these can hardly be said to have created a "'comprehensive'" scheme that puts hotel owners on notice that their "'property will be subject to periodic inspections undertaken for specific purposes,'" *Burger*, 482 U. S., at 705, n. 16 (quoting *Dewey*, 452 U. S., at 600). Instead, they are more akin to the widely applicable minimum wage and maximum hour rules that the Court rejected as a basis for deeming "the entirety of American interstate commerce" to be closely regulated in *Barlow's, Inc.* 436 U. S., at 314. If such general regulations were sufficient to invoke the closely regulated industry exception, it would be hard to imagine a type of business that would not qualify. See Brief for Google Inc. as *Amicus Curiae* 16–17; Brief for the Chamber of Commerce of United States of America as *Amicus Curiae* 12–13.

Petitioner attempts to recast this hodgepodge of regulations as a comprehensive scheme by referring to a "centuries-old tradition" of warrantless searches of hotels. Brief for Petitioner 34–36. History is relevant when determining whether an industry is closely regulated. See, *e.g., Burger*, 482 U. S., at 707. The historical record here, however, is not as clear as petitioner suggests. The City and JUSTICE SCALIA principally point to evidence that hotels were treated as public accommodations. Brief for Petitioner 34–36; *post*, at 5–6, and n. 1. For instance, the

Commonwealth of Massachusetts required innkeepers to "'furnish[] . . . suitable provisions and lodging, for the refreshment and entertainment of strangers and travellers, pasturing and stable room, hay and provender . . . for their horses and cattle.'" Brief for Petitioner 35 (quoting An Act For The Due Regulation Of Licensed Houses (1786), reprinted in Acts and Laws of the Commonwealth of Massachusetts 209 (1893)). But laws obligating inns to provide suitable lodging to all paying guests are not the same as laws subjecting inns to warrantless searches. Petitioner also asserts that "[f]or a long time, [hotel] owners left their registers open to widespread inspection." Brief for Petitioner 51. Setting aside that modern hotel registries contain sensitive information, such as driver's licenses and credit card numbers for which there is no historic analog, the fact that some hotels chose to make registries accessible to the public has little bearing on whether government authorities could have viewed these documents on demand without a hotel's consent.

Even if we were to find that hotels are pervasively regulated, §41.49 would need to satisfy three additional criteria to be reasonable under the Fourth Amendment: (1) "[T]here must be a 'substantial' government interest that informs the regulatory scheme pursuant to which the inspection is made"; (2) "the warrantless inspections must be 'necessary' to further [the] regulatory scheme"; and (3) "the statute's inspection program, in terms of the certainty and regularity of its application, [must] provid[e] a constitutionally adequate substitute for a warrant." *Burger*, 482 U. S., at 702–703 (internal quotation marks omitted). We assume petitioner's interest in ensuring that hotels maintain accurate and complete registries might fulfill the first of these requirements, but conclude that §41.49 fails the second and third prongs of this test.

The City claims that affording hotel operators any opportunity for precompliance review would fatally under-

mine the scheme's efficacy by giving operators a chance to falsify their records. Brief for Petitioner 41–42. The Court has previously rejected this exact argument, which could be made regarding any recordkeeping requirement. See *Barlow's*, *Inc.*, 436 U. S., at 320 ("[It is not] apparent why the advantages of surprise would be lost if, after being refused entry, procedures were available for the [Labor] Secretary to seek an *ex parte* warrant to reappear at the premises without further notice to the establishment being inspected"); cf. *Lone Steer*, 464 U. S., at 411, 415 (affirming use of administrative subpoena which provided an opportunity for precompliance review as a means for obtaining "payroll and sales records"). We see no reason to accept it here.

As explained above, nothing in our decision today precludes an officer from conducting a surprise inspection by obtaining an *ex parte* warrant or, where an officer reasonably suspects the registry would be altered, from guarding the registry pending a hearing on a motion to quash. See *Barlow's, Inc.*, 436 U. S., at 319–321; *Riley*, 573 U. S., at \_\_\_ (slip op., at 12). JUSTICE SCALIA's claim that these procedures will prove unworkable given the large number of hotels in Los Angeles is a red herring. See *post*, at 11. While there are approximately 2,000 hotels in Los Angeles, *ibid.*, there is no basis to believe that resort to such measures will be needed to conduct spot checks in the vast majority of them. See *supra,* at 11.

Section 41.49 is also constitutionally deficient under the "certainty and regularity" prong of the closely regulated industries test because it fails sufficiently to constrain police officers' discretion as to which hotels to search and under what circumstances. While the Court has upheld inspection schemes of closely regulated industries that called for searches at least four times a year, *Dewey*, 452 U. S., at 604, or on a "regular basis," *Burger*, 482 U. S., at 711, §41.49 imposes no comparable standard.

\*     \*     \*

For the foregoing reasons, we agree with the Ninth Circuit that §41.49(3)(a) is facially invalid insofar as it fails to provide any opportunity for precompliance review before a hotel must give its guest registry to the police for inspection. Accordingly, the judgment of the Ninth Circuit is affirmed.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 13–1175

_____

## CITY OF LOS ANGELES, CALIFORNIA, PETITIONER *v.* NARANJIBHAI PATEL, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 22, 2015]

JUSTICE SCALIA, with whom THE CHIEF JUSTICE and JUSTICE THOMAS join, dissenting.

The city of Los Angeles, like many jurisdictions across the country, has a law that requires motels, hotels, and other places of overnight accommodation (hereinafter motels) to keep a register containing specified information about their guests. Los Angeles Municipal Code (LAMC) §41.49(2) (2015). The purpose of this recordkeeping requirement is to deter criminal conduct, on the theory that criminals will be unwilling to carry on illicit activities in motel rooms if they must provide identifying information at check-in. Because this deterrent effect will only be accomplished if motels actually do require guests to provide the required information, the ordinance also authorizes police to conduct random spot checks of motels' guest registers to ensure that they are properly maintained. §41.49(3). The ordinance limits these spot checks to the four corners of the register, and does not authorize police to enter any nonpublic area of the motel. To the extent possible, police must conduct these spot checks at times that will minimize any disruption to a motel's business.

The parties do not dispute the governmental interests at stake. Motels not only provide housing to vulnerable transient populations, they are also a particularly attractive site for criminal activity ranging from drug dealing

and prostitution to human trafficking. Offering privacy and anonymity on the cheap, they have been employed as prisons for migrants smuggled across the border and held for ransom, see Sanchez, Immigrant Smugglers Become More Ruthless, Washington Post, June 28, 2004, p. A3; Wagner, Human Smuggling, Arizona Republic, July 23, 2006, p. A1, and rendezvous sites where child sex workers meet their clients on threat of violence from their procurers.

Nevertheless, the Court today concludes that Los Angeles's ordinance is "unreasonable" inasmuch as it permits police to flip through a guest register to ensure it is being filled out without first providing an opportunity for the motel operator to seek judicial review. Because I believe that such a limited inspection of a guest register is eminently reasonable under the circumstances presented, I dissent.

I

I assume that respondents may bring a facial challenge to the City's ordinance under the Fourth Amendment. Even so, their claim must fail because, as discussed *infra*, the law is constitutional in most, if not all, of its applications. See *United States* v. *Salerno*, 481 U. S. 739, 751 (1987). But because the Court discusses the propriety of a facial challenge at some length, I offer a few thoughts.

Article III limits our jurisdiction to "Cases" and "Controversies." Accordingly, "[f]ederal courts may not 'decide questions that cannot affect the rights of litigants in the case before them' or give 'opinion[s] advising what the law would be upon a hypothetical state of facts.'" *Chafin* v. *Chafin*, 568 U. S. ___, ___ (2013) (slip op., at 5). To be sure, the *reasoning* of a decision may suggest that there is no permissible application of a particular statute, *Chicago* v. *Morales,* 527 U. S. 41, 77 (1999) (SCALIA, J., dissenting), and under the doctrine of *stare decisis*, this reasoning—to

the extent that it is necessary to the holding—will be binding in all future cases. But in this sense, the facial invalidation of a statute is a logical consequence of the Court's opinion, not the immediate effect of its judgment. Although we have at times described our holdings as invalidating a law, it is always the application of a law, rather than the law itself, that is before us.

The upshot is that the effect of a given case is a function not of the plaintiff's characterization of his challenge, but the narrowness or breadth of the ground that the Court relies upon in disposing of it. If a plaintiff elects not to present any case-specific facts in support of a claim that a law is unconstitutional—as is the case here—he will limit the grounds on which a Court may find for him to highly abstract rules that would have broad application in future cases. The decision to do this might be a poor strategic move, especially in a Fourth Amendment case, where the reasonableness of a search is a highly factbound question and general, abstract rules are hard to come by. Cf. *Sibron* v. *New York*, 392 U. S. 40, 59 (1968). But even had the plaintiffs in this case presented voluminous facts in a self-styled as-applied challenge, nothing would force this Court to rely upon those facts rather than the broader principle that the Court has chosen to rely upon. I see no reason why a plaintiff's self-description of his challenge as facial would provide an independent reason to reject it unless we were to delegate to litigants our duty to say what the law is.

## II

The Fourth Amendment provides, in relevant part, that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause." Grammatically, the two clauses of the Amendment seem to be independent—and

directed at entirely different actors. The former tells the
executive what it must do when it conducts a search, and
the latter tells the judiciary what it must do when it issues
a search warrant. But in an effort to guide courts in ap-
plying the Search-and-Seizure Clause's indeterminate
reasonableness standard, and to maintain coherence in
our case law, we have used the Warrant Clause as a
guidepost for assessing the reasonableness of a search,
and have erected a framework of presumptions applicable
to broad categories of searches conducted by executive
officials. Our case law has repeatedly recognized, how-
ever, that these are mere presumptions, and the only consti-
tutional *requirement* is that a search be reasonable.

When, for example, a search is conducted to enforce an
administrative regime rather than to investigate criminal
wrongdoing, we have been willing to modify the probable-
cause standard so that a warrant may issue absent indi-
vidualized suspicion of wrongdoing. Thus, our cases say a
warrant may issue to inspect a structure for fire-code
violations on the basis of such factors as the passage of
time, the nature of the building, and the condition of the
neighborhood. *Camara* v. *Municipal Court of City and
County of San Francisco,* 387 U. S. 523, 538–539 (1967).
As we recognized in that case, "reasonableness is still the
ultimate standard. If a valid public interest justifies the
intrusion contemplated, then there is probable cause to
issue a suitably restricted search warrant." *Id.*, at 539.
And precisely "because the ultimate touchstone of the
Fourth Amendment is 'reasonableness,'" even the pre-
sumption that the search of a home without a warrant is
unreasonable "is subject to certain exceptions." *Brigham
City* v. *Stuart*, 547 U. S. 398, 403 (2006).

One exception to normal warrant requirements applies
to searches of closely regulated businesses. "[W]hen an
entrepreneur embarks upon such a business, he has vol-
untarily chosen to subject himself to a full arsenal of

governmental regulation," and so a warrantless search to enforce those regulations is not unreasonable. *Marshall* v. *Barlow's, Inc.*, 436 U. S. 307, 313 (1978). Recognizing that warrantless searches of closely regulated businesses may nevertheless *become* unreasonable if arbitrarily conducted, we have required laws authorizing such searches to satisfy three criteria: (1) There must be a "'substantial' government interest that informs the regulatory scheme pursuant to which the inspection is made"; (2) "the warrantless inspections must be 'necessary to further [the] regulatory scheme'"; and (3) "'the statute's inspection program, in terms of the certainty and regularity of its application, [must] provid[e] a constitutionally adequate substitute for a warrant.'" *New York* v. *Burger*, 482 U. S. 691, 702–703 (1987).

Los Angeles's ordinance easily meets these standards.

## A

In determining whether a business is closely regulated, this Court has looked to factors including the duration of the regulatory tradition, *id.,* at 705–707, *Colonnade Catering Corp.* v. *United States*, 397 U. S. 72, 75–77 (1970), *Donovan* v. *Dewey*, 452 U. S. 594, 606 (1981); the comprehensiveness of the regulatory regime, *Burger, supra,* at 704–705, *Dewey, supra*, at 606; and the imposition of similar regulations by other jurisdictions, *Burger, supra,* at 705. These factors are not talismans, but shed light on the expectation of privacy the owner of a business may reasonably have, which in turn affects the reasonableness of a warrantless search. See *Barlow's, supra,* at 313.

Reflecting the unique public role of motels and their commercial forebears, governments have long subjected these businesses to unique public duties, and have established inspection regimes to ensure compliance. As Blackstone observed, "Inns, in particular, being intended for the lodging and receipt of travellers, may be indicted, sup-

pressed, and the inn-keepers fined, if they refuse to enter-
tain a traveller without a very sufficient cause: for thus to
frustrate the end of their institution is held to be disorderly
behavior." 4 W. Blackstone, Commentaries on the Laws
of England 168 (1765). Justice Story similarly recognized
"[t]he soundness of the public policy of subjecting particu-
lar classes of persons to extraordinary responsibility, in
cases where an extraordinary confidence is necessarily
reposed in them, and there is an extraordinary temptation
to fraud, or danger of plunder." J. Story, Commentaries
on the Law of Bailments §464, pp. 487–488 (5th ed. 1851).
Accordingly, in addition to the obligation to receive any
paying guest, "innkeepers are bound to take, not merely
ordinary care, but uncommon care, of the goods, money,
and baggage of their guests," *id.,* §470, at 495, as travel-
lers "are obliged to rely almost implicitly on the good faith
of innholders, whose education and morals are none of the
best, and who might have frequent opportunities of asso-
ciating with ruffians and pilferers," *id.,* §471, at 498.

These obligations were not merely aspirational. At the
time of the founding, searches—indeed, warrantless
searches—of inns and similar places of public accommoda-
tion were commonplace. For example, although Massa-
chusetts was perhaps the State most protective against
government searches, "the state code of 1788 still allowed
tithingmen to search public houses of entertainment on
every Sabbath without any sort of warrant." W. Cuddihy,
Fourth Amendment: Origins and Original Meaning 602–
1791, 743 (2009).[1]

As this evidence demonstrates, the regulatory tradition
governing motels is not only longstanding, but comprehen-

_____

[1] As Beale helpfully confirms, "[f]rom the earliest times the funda-
mental characteristic of an inn has been its public nature. It is a public
house, a house of public entertainment, or, as it is legally phrased, a
common inn." J. Beale, The Law of Innkeepers and Hotels §11, p. 10
(1906).

sive. And the tradition continues in Los Angeles. The City imposes an occupancy tax upon transients who stay in motels, LAMC §21.7.3, and makes the motel owner responsible for collecting it, §21.7.5. It authorizes city officials "to enter [a motel], free of charge, during business hours" in order to "inspect and examine" them to determine whether these tax provisions have been complied with. §§21.7.9, 21.15. It requires all motels to obtain a "Transient Occupancy Registration Certificate," which must be displayed on the premises. §21.7.6. State law requires motels to "post in a conspicuous place . . . a statement of rate or range of rates by the day for lodging," and forbids any charges in excess of those posted rates. Cal. Civ. Code Ann. §1863 (West 2010). Hotels must change bed linens between guests, Cal. Code Regs., tit. 25, §40 (2015), and they must offer guests the option not to have towels and linens laundered daily, LAMC §121.08. "Multiuse drinking utensils" may be placed in guest rooms only if they are "thoroughly washed and sanitized after each use" and "placed in protective bags." Cal. Code Regs., tit. 17, §30852. And state authorities, like their municipal counterparts, "may at reasonable times enter and inspect any hotels, motels, or other public places" to ensure compliance. §30858.

The regulatory regime at issue here is thus substantially *more* comprehensive than the regulations governing junkyards in *Burger*, where licensing, inventory-recording, and permit-posting requirements were found sufficient to qualify the industry as closely regulated. 482 U. S., at 704–705. The Court's suggestion that these regulations are not sufficiently targeted to motels, and are "akin to . . . minimum wage and maximum hour rules," *ante*, at 15, is simply false. The regulations we have described above reach into the "minutest detail[s]" of motel operations, *Barlow's, supra,* at 314, and those who enter that business today (like those who have entered it over the centuries)

do so with an expectation that they will be subjected to especially vigilant governmental oversight.

Finally, this ordinance is not an outlier. The City has pointed us to more than 100 similar register-inspection laws in cities and counties across the country, Brief for Petitioner 36, and n. 3, and that is far from exhaustive. In all, municipalities in at least 41 States have laws similar to Los Angeles's, Brief for National League of Cities et al. as *Amici Curiae* 16–17, and at least 8 States have their own laws authorizing register inspections, Brief for California et al. as *Amici Curiae* 12–13.

This copious evidence is surely enough to establish that "[w]hen a [motel operator] chooses to engage in this pervasively regulated business . . . he does so with the knowledge that his business records . . . will be subject to effective inspection." *United States* v. *Biswell*, 406 U. S. 311, 316 (1972). And *that* is the relevant constitutional test—not whether this regulatory superstructure is "the same as laws subjecting inns to warrantless searches," or whether, as an historical matter, government authorities not only required these documents to be kept but permitted them to be viewed on demand without a motel's consent. *Ante,* at 16.

The Court's observation that "[o]ver the past 45 years, the Court has identified only four industries" as closely regulated, *ante*, at 14, is neither here nor there. Since we first concluded in *Colonnade Catering* that warrantless searches of closely regulated businesses are reasonable, we have only identified *one* industry as *not* closely regulated, see *Barlow's,* 436 U. S., at 313–314. The Court's statistic thus tells us more about how this Court exercises its discretionary review than it does about the number of industries that qualify as closely regulated. At the same time, lower courts, which do not have the luxury of picking the cases they hear, have identified many more businesses as closely regulated under the test we have announced:

pharmacies, *United States* v. *Gonsalves*, 435 F. 3d 64, 67 (CA1 2006); massage parlors, *Pollard* v. *Cockrell*, 578 F. 2d 1002, 1014 (CA5 1978); commercial-fishing operations, *United States* v. *Raub*, 637 F. 2d 1205, 1208–1209 (CA9 1980); day-care facilities, *Rush* v. *Obledo*, 756 F. 2d 713, 720–721 (CA9 1985); nursing homes, *People* v. *Firstenberg*, 92 Cal. App. 3d 570, 578–580, 155 Cal. Rptr. 80, 84–86 (1979); jewelers, *People* v. *Pashigian*, 150 Mich. App. 97, 100–101, 388 N. W. 2d 259, 261–262 (1986) (*per curiam*); barbershops, *Stogner* v. *Kentucky*, 638 F. Supp. 1, 3 (WD Ky. 1985); and yes, even rabbit dealers, *Lesser* v. *Espy*, 34 F. 3d 1301, 1306–1307 (CA7 1994). Like automobile junkyards and catering companies that serve alcohol, many of these businesses are far from "intrinsically dangerous," cf. *ante*, at 14, n. 5. This should come as no surprise. The reason closely regulated industries may be searched without a warrant has nothing to do with the risk of harm they pose; rather, it has to do with the expectations of those who enter such a line of work. See *Barlow's*, *supra,* at 313.

## B

The City's ordinance easily satisfies the remaining *Burger* requirements: It furthers a substantial governmental interest, it is necessary to achieving that interest, and it provides an adequate substitute for a search warrant.

Neither respondents nor the Court question the substantial interest of the City in deterring criminal activity. See Brief for Respondents 34–41; *ante*, at 15. The private pain and public costs imposed by drug dealing, prostitution, and human trafficking are beyond contention, and motels provide an obvious haven for those who trade in human misery.

Warrantless inspections are also necessary to advance this interest. Although the Court acknowledges that law

enforcement can enter a motel room without a warrant when exigent circumstances exist, see *ante*, at 13, n. 4, the whole reason criminals use motel rooms in the first place is that they offer privacy and secrecy, so that police will never come to discover these exigencies. The recordkeeping requirement, which all parties admit is permissible, therefore operates by *deterring* crime. Criminals, who depend on the anonymity that motels offer, will balk when confronted with a motel's demand that they produce identification. And a motel's evasion of the recordkeeping requirement fosters crime. In San Diego, for example, motel owners were indicted for collaborating with members of the Crips street gang in the prostitution of underage girls; the motel owners "set aside rooms apart from the rest of their legitimate customers where girls and women were housed, charged the gang members/pimps a higher rate for the rooms where 'dates' or 'tricks' took place, and warned the gang members of inquiries by law enforcement." Office of the Attorney General, Cal. Dept. of Justice, The State of Human Trafficking in California 25 (2012). The warrantless inspection requirement provides a necessary incentive for motels to maintain their registers thoroughly and accurately: They never know when law enforcement might drop by to inspect.

Respondents and the Court acknowledge that *inspections* are necessary to achieve the purposes of the recordkeeping regime, but insist that *warrantless* inspections are not. They have to acknowledge, however, that the motel operators who conspire with drug dealers and procurers may demand precompliance judicial review simply as a pretext to buy time for making fraudulent entries in their guest registers. The Court therefore must resort to arguing that warrantless inspections are not "necessary" because other alternatives exist.

The Court suggests that police could obtain an administrative subpoena to search a guest register and, if a motel

moves to quash, the police could "guar[d] the registry pending a hearing" on the motion. *Ante*, at 17. This proposal is equal parts 1984 and Alice in Wonderland. It protects motels from government inspection of their registers by authorizing government agents to seize the registers[2] (if "guarding" entails forbidding the register to be moved) or to upset guests by a prolonged police presence at the motel. The Court also notes that police can obtain an *ex parte* warrant before conducting a register inspection. *Ante,* at 17. Presumably such warrants could issue without probable cause of wrongdoing by a particular motel, see *Camara*, 387 U. S., at 535–536; otherwise, this would be no alternative at all. Even so, under this regime police would have to obtain an *ex parte* warrant before *every* inspection. That is because law enforcement would have no way of knowing ahead of time which motels would refuse consent to a search upon request; and if they wait to obtain a warrant until consent is refused, motels will have the opportunity to falsify their guest registers while the police jump through the procedural hoops required to obtain a warrant. It is quite plausible that the costs of this always-get-a-warrant "alternative" would be prohibitive for a police force in one of America's largest cities, juggling numerous law-enforcement priorities, and confronting more than 2,000 motels within its jurisdiction. E. Wallace, K. Pollock, B. Horth, S. Carty, & N. Elyas, Los Angeles Tourism: A Domestic and International Analysis 7 (May 2014 online at http://www.lachamber.com/clientuploads/Global_Programs/WTW/2014/LATourism_LMU_May2014.pdf (as visited June 19, 2015, and available in Clerk of Court's

––––––––

[2] We are not at all "baffled at the idea that . . . police officers may seize something that they cannot immediately search." *Ante*, at 12, n. 3. We are baffled at the idea that anyone would think a seizure of required records less intrusive than a visual inspection.

case file). To be sure, the fact that obtaining a warrant might be costly will not by itself render a warrantless search reasonable under the Fourth Amendment; but it can render a warrantless search *necessary* in the context of an administrative-search regime governing closely regulated businesses.

But all that discussion is in any case irrelevant. The administrative search need only be reasonable. It is not the burden of Los Angeles to show that there are no less restrictive means of achieving the City's purposes. Sequestration or *ex parte* warrants were *possible* alternatives to the warrantless search regimes approved by this Court in *Colonnade Catering*, *Biswell*, *Dewey*, and *Burger*. By importing a least-restrictive-means test into *Burger*'s Fourth Amendment framework, today's opinion implicitly overrules that entire line of cases.

Finally, the City's ordinance provides an adequate substitute for a warrant. Warrants "advise the owner of the scope and objects of the search, beyond which limits the inspector is not expected to proceed." *Barlow's*, 436 U. S., at 323. Ultimately, they aim to protect against "devolv[ing] almost unbridled discretion upon executive and administrative officers, particularly those in the field, as to when to search and whom to search." *Ibid.*

Los Angeles's ordinance provides that the guest register must be kept in the guest reception or guest check-in area, or in an adjacent office, and that it "be made available to any officer of the Los Angeles Police Department for inspection. Whenever possible, the inspection shall be conducted at a time and in a manner that minimizes any interference with the operation of the business." LAMC §41.49(3). Nothing in the ordinance authorizes law enforcement to enter a nonpublic part of the motel. Compare this to the statute upheld in *Colonnade Catering*, which provided that "'[t]he Secretary or his delegate may enter, in the daytime, any building or place where any articles or

objects subject to tax are made, produced, or kept, so far as it may be necessary for the purpose of examining said articles or objects,'" 397 U. S., at 73, n. 2 (quoting 26 U. S. C. §7606(a) (1964 ed.)); or the one in *Biswell*, which stated that "'[t]he Secretary may enter during business hours the premises (including places of storage) of any firearms or ammunition importer . . . for the purpose of inspecting or examining (1) any records or documents required to be kept . . . , and (2) any firearms or ammunition kept or stored,'" 406 U. S., at 312, n. 1 (quoting 18 U. S. C. §923(g) (1970 ed.)); or the one in *Dewey*, which granted federal mine inspectors "'a right of entry to, upon, or through any coal or other mine,'" 452 U. S., at 596 (quoting 30 U. S. C. §813(a) (1976 ed., Supp. III)); or the one in *Burger*, which compelled junkyard operators to "'produce such records and permit said agent or police officer to examine them and any vehicles or parts of vehicles which are subject to the record keeping requirements of this section and which are on the premises,'" 482 U. S., at 694, n. 1 (quoting N. Y. Veh. & Traf. Law §415–a5 (McKinney 1986)). The Los Angeles ordinance—which limits warrantless police searches to the pages of a guest register in a public part of a motel—circumscribes police discretion in much more exacting terms than the laws we have approved in our earlier cases.

The Court claims that Los Angeles's ordinance confers too much discretion because it does not adequately limit the *frequency* of searches. Without a trace of irony, the Court tries to distinguish Los Angeles's law from the laws upheld in *Dewey* and *Burger* by pointing out that the latter regimes required inspections at least four times a year and on a "'regular basis,'" respectively. *Ante*, at 17. But the warrantless police searches of a business "10 times a day, every day, for three months" that the Court envisions under Los Angeles's regime, *ante*, at 11, are entirely consistent with the regimes in *Dewey* and *Burger*;

10 times a day, every day, is "at least four times a year," and on a (much too) "'regular basis.'" *Ante,* at 17.

That is not to say that the Court's hypothetical searches are necessarily constitutional. It is only to say that Los Angeles's ordinance presents no greater risk that such a hypothetical will materialize than the laws we have already upheld. As in our earlier cases, we should leave it to lower courts to consider on a case-by-case basis whether warrantless searches have been conducted in an unreasonably intrusive or harassing manner.

## III

The Court reaches its wrongheaded conclusion not simply by misapplying our precedent, but by mistaking our precedent for the Fourth Amendment itself. Rather than bother with the text of that Amendment, the Court relies exclusively on our administrative-search cases, *Camara*, *See* v. *Seattle,* 387 U. S. 541 (1967), and *Barlow's*. But the Constitution predates 1967, and it remains the supreme law of the land today. Although the categorical framework our jurisprudence has erected in this area may provide us guidance, it is guidance to answer the constitutional question at issue: whether the challenged search is *reasonable*.

An administrative, warrantless-search ordinance that narrowly limits the scope of searches to a single business record, that does not authorize entry upon premises not open to the public, and that is supported by the need to prevent fabrication of guest registers, is, to say the least, far afield from the laws at issue in the cases the Court relies upon. The Court concludes that such minor intrusions, permissible when the police are trying to tamp down the market in stolen auto parts, are "unreasonable" when police are instead attempting to stamp out the market in child sex slaves.

Because I believe that the limited warrantless searches

authorized by Los Angeles's ordinance are reasonable under the circumstances, I respectfully dissent.

# SUPREME COURT OF THE UNITED STATES

_____

No. 13–1175

_____

## CITY OF LOS ANGELES, CALIFORNIA, PETITIONER _v._ NARANJIBHAI PATEL, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 22, 2015]

JUSTICE ALITO, with whom JUSTICE THOMAS joins, dissenting.

After today, the city of Los Angeles can never, under any circumstances, enforce its 116-year-old requirement that hotels make their registers available to police officers. That is because the Court holds that §41.49(3)(a) of the Los Angeles Municipal Code (2015) is _facially_ unconstitutional. Before entering a judgment with such serious safety and federalism implications, the Court must conclude that every application of this law is unconstitutional—_i.e._, that "'no set of circumstances exists under which the [law] would be valid.'" _Ante,_ at 7 (quoting _United States_ v. _Salerno_, 481 U. S. 739, 745 (1987)). I have doubts about the Court's approach to administrative searches and closely regulated industries. _Ante,_ at 9–17. But even if the Court were 100% correct, it still should uphold §41.49(3)(a) because many other applications of this law are constitutional. Here are five examples.

Example One. The police have probable cause to believe that a register contains evidence of a crime. They go to a judge and get a search warrant. The hotel operator, however, refuses to surrender the register, but instead stashes it away. Officers could tear the hotel apart looking for it. Or they could simply order the operator to produce it. The Fourth Amendment does not create a right to defy a war-

rant. Hence §41.49(3)(a) could be constitutionally applied in this scenario. Indeed, the Court concedes that it is proper to apply a California obstruction of justice law in such a case. See *ante,* at 8–9, n. 1; Brief for Respondents 49. How could applying a city law with a similar effect be different? No one thinks that overlapping laws are unconstitutional. See, *e.g., Yates* v. *United States*, 574 U. S. ___, ___ (2015) (KAGAN, J. dissenting) (slip op., at 10–11) ("Overlap—even significant overlap—abounds in criminal law") (collecting citations). And a specific law gives more notice than a general law.

In any event, the Los Angeles ordinance is arguably broader in at least one important respect than the California obstruction of justice statute on which the Court relies. *Ante*, at 8–9, n. 1. The state law applies when a person "willfully resists, delays, or obstructs any public officer . . . in the discharge or attempt to discharge any duty of his or her office." Cal. Penal Code Ann. §148(a)(1) (West 2014). In the example set out above, suppose that the hotel operator, instead of hiding the register, simply refused to tell the police where it is located. The Court cites no California case holding that such a refusal would be unlawful, and the city of Los Angeles submits that under California law, "[o]bstruction statutes prohibit a hotel owner from *obstructing* a search, but they do not require affirmative assistance." Reply Brief 5. The Los Angeles ordinance, by contrast, unequivocally requires a hotel operator to make the register available on request.

Example Two. A murderer has kidnapped a woman with the intent to rape and kill her and there is reason to believe he is holed up in a certain motel. The Fourth Amendment's reasonableness standard accounts for exigent circumstances. See, *e.g., Brigham City* v. *Stuart*, 547 U. S. 398, 403 (2006). When the police arrive, the motel operator folds her arms and says the register is locked in a safe. Invoking §41.49(3)(a), the police order the operator

to turn over the register. She refuses. The Fourth Amendment does not protect her from arrest.

Example Three. A neighborhood of "pay by the hour" motels is a notorious gathering spot for child-sex traffickers. Police officers drive through the neighborhood late one night and see unusual amounts of activity at a particular motel. The officers stop and ask the motel operator for the names of those who paid with cash to rent rooms for less than three hours. The operator refuses to provide the information. Requesting to see the register—and arresting the operator for failing to provide it—would be reasonable under the "totality of the circumstances." *Ohio* v. *Robinette*, 519 U. S. 33, 39 (1996). In fact, the Court has upheld a similar reporting duty against a Fourth Amendment challenge where the scope of information required was also targeted and the public's interest in crime prevention was no less serious. See *California Bankers Assn.* v. *Shultz*, 416 U. S. 21, 39, n. 15, 66–67 (1974) (having "no difficulty" upholding a requirement that banks must provide reports about transactions involving more than $10,000, including the name, address, occupation, and social security number of the customer involved, along with a summary of the transaction, the amount of money at issue, and the type of identification presented).

Example Four. A motel is operated by a dishonest employee. He has been charging more for rooms than he records, all the while pocketing the difference. The owner finds out and eagerly consents to a police inspection of the register. But when officers arrive and ask to see the register, the operator hides it. The Fourth Amendment does not allow the operator's refusal to defeat the owner's consent. See, *e.g., Mancusi* v. *DeForte*, 392 U. S. 364, 369–370 (1968). Accordingly, it would not violate the Fourth Amendment to arrest the operator for failing to make the register "available to any officer of the Los Angeles Police Department for inspection." §41.49(3)(a).

Example Five. A "mom and pop" motel always keeps its old-fashioned guest register open on the front desk. Anyone who wants to can walk up and leaf through it. (Such motels are not as common as they used to be, but Los Angeles is a big place.) The motel has no reasonable expectation of privacy in the register, and no one doubts that police officers—like anyone else—can enter into the lobby. See, *e.g., Florida* v. *Jardines*, 569 U. S. 1, ___ (2013) (slip op., at 6); *Donovan* v. *Lone Steer, Inc.*, 464 U. S. 408, 413 (1984). But when an officer starts looking at the register, as others do, the motel operator at the desk snatches it away and will not give it back. Arresting that person would not violate the Fourth Amendment.

These are just five examples. There are many more. The Court rushes past examples like these by suggesting that §41.49(3)(a) does no "work" in such scenarios. *Ante,* at 8. That is not true. Under threat of legal sanction, this law orders hotel operators to do things they do not want to do. To be sure, there may be circumstances in which §41.49(3)(a)'s command conflicts with the Fourth Amendment, and in those circumstances the Fourth Amendment is supreme. See U. S. Const., Art VI, cl. 2. But no different from any other local law, the remedy for such circumstances should be an as-applied injunction *limited to the conflict with the Fourth Amendment*. Such an injunction would protect a hotel from being "searched 10 times a day, every day, for three months, without any violation being found." *Ante,* at 11. But unlike facial invalidation, an as-applied injunction does not produce collateral damage. Section 41.49(3)(a) should be enforceable in those many cases in which the Fourth Amendment is not violated.

There are serious arguments that the Fourth Amendment's application to warrantless searches and seizures is inherently inconsistent with facial challenges. See *Sibron* v. *New York*, 392 U. S. 40, 59, 62 (1968) (explaining that because of the Fourth Amendment's reasonableness re-

quirement, "[t]he constitutional validity of a warrantless search is pre-eminently the sort of question which can only be decided in the concrete factual context of the individual case"); Brief for Manhattan Institute for Policy Research as *Amicus Curiae* 33 ("A constitutional claim under the first clause of the Fourth Amendment is never a 'facial' challenge, because it is always and inherently a challenge to executive action"). But assuming such facial challenges ever make sense conceptually, this particular one fails under basic principles of facial invalidation. The Court's contrary holding is befuddling. I respectfully dissent.