COURT OF APPEALS OF VIRGINIA

Present:   Judges Humphreys, Chafin and AtLee
Argued at Lexington, Virginia

PUBLISHED

JOHN TAYLOR

v.        Record No. 1593-18-3

VIRGINIA ALCOHOLIC BEVERAGE
 CONTROL AUTHORITY

OPINION BY
JUDGE ROBERT J. HUMPHREYS
APRIL 30, 2019

FROM THE CIRCUIT COURT OF THE CITY OF STAUNTON
Charles L. Ricketts, III, Judge

Mark Bong for appellant.

Samuel T. Towell, Deputy Attorney General (Mark R. Herring,
Attorney General; Tara Lynn R. Zurawski, Senior Assistant
Attorney General; Gregory C. Fleming, Senior Assistant Attorney
General; Sarah Flynn Robb, Assistant Attorney General, on brief),
for appellee.

On July 24, 2017, the Virginia Alcoholic Beverage Control Authority[1] ("ABC" or

"agency") terminated appellant John Taylor's ("Taylor") employment.  Prior to his termination,

Taylor served as ABC's "Region 3 Special Agent in Charge."  On July 24, 2017, however, the

Agency issued Taylor a "Group III" written notice of disciplinary action with removal, i.e.,

termination.[2]  The Group III written notice alleged that Taylor violated an ABC licensee's

---

[1] The Virginia Alcoholic Beverage Control Authority is the "successor in interest to the Department of Alcoholic Beverage Control and the Alcoholic Beverage Control Board."  Code § 4.1-101(B).

[2] The Virginia Department of Human Resource Management Policies and Procedures Manual, in Policy 1.60, sets forth certain "standards of conduct" and describes levels of offenses ranging from the lowest level, "Group I," to the highest level, "Group III."  According to the policy, Group III offenses include "acts of misconduct of such a severe nature that a first occurrence normally should warrant termination."  This includes acts that "endanger others in the

constitutional rights by ordering the seizure of money and other evidence without a search warrant or written consent. On July 31, 2017, Taylor filed a grievance challenging his termination and, pursuant to Code § 2.2-3000 *et seq.*, requested a hearing before a hearing officer appointed by the Virginia Department of Human Resources Management ("DHRM").

The hearing officer upheld Taylor's termination. Taylor subsequently requested that the Office of Equal Employment and Dispute Resolution ("EEDR") at DHRM conduct an administrative review of the hearing officer's decision. Taylor also sought to present newly discovered evidence. EEDR, however, declined to disturb the hearing officer's decision. Taylor then appealed the hearing officer's decision to the Circuit Court for the City of Staunton (the "circuit court"), which denied Taylor's appeal. In doing so, the circuit court held that the hearing officer's decision was not contrary to law.

On appeal to this Court, Taylor asserts eleven assignments of error. In his first assignment of error, Taylor argues that the circuit court erred in affirming the hearing officer's decision because his termination was based, at least in part, on violations of ABC policies that permitted ABC to impermissibly "interpret and define the limits of the Fourth Amendment[.]" In his second and third assignments of error, Taylor argues that the circuit court erred because neither ABC nor the licensee's "employees" or "corporate officers" had standing to assert a Fourth Amendment violation against Taylor, on behalf of the licensee. In his next seven assignments of error, Taylor argues that the circuit court erred because he did not violate a licensee's Fourth Amendment rights. More specifically, Taylor argues that numerous exceptions to the Fourth Amendment's warrant requirement as a prerequisite to a search or seizure applied,

workplace[;] constitute illegal or unethical conduct; neglect of duty; disruption in the workplace; *or other serious violations of policies, procedures, or laws*." Virginia Department of Human Resource Management Policies and Procedures, Standards of Conduct: Policy 1.60 (Apr. 16, 2008) (emphasis added).

including the highly regulated industry exception, plain view, exigent circumstances, and consent. In his final assignment of error, Taylor makes what we assume is essentially a due process argument. Taylor therein argues that the circuit court erred in upholding his termination because ABC "failed to follow its own internal policies" and "departed from fair and unprejudiced discipline."

## I. BACKGROUND

This Court is bound by the hearing officer's factual findings. In an appeal of this nature, this Court's sole role is to consider whether the hearing officer's decision, based upon those factual findings, was "consistent with law and policy." See Osburn v. Va. Dep't of Alcoholic Beverage Control, 295 Va. 10, 17 (2018); see also Code § 2.2-3005.1(C).

On October 23, 2017, a hearing regarding Taylor's termination took place. In a subsequent decision dated February 12, 2018, the hearing officer upheld Taylor's Group III written notice of disciplinary action. In his decision, the hearing officer noted that ABC employed Taylor as a regional "Special Agent in Charge." In that capacity, Taylor was assigned to the ABC Bureau of Law Enforcement Operations, and his responsibilities included the supervision and oversight of all criminal and administrative investigations conducted by the special agents assigned to the Region 3 enforcement office. Taylor also served as a liaison with federal, state, and local officials, as well as command level personnel with other law enforcement agencies throughout the Commonwealth.

Taylor's position as a Special Agent in Charge required him to supervise subordinate supervisors, including the Assistant Special Agent in Charge, Daniel Blye ("ASAC Blye"). ASAC Blye, in turn, supervised the special agents and all investigations conducted by the region. During the time period relevant to this case, Special Agents Kevin Weatherholtz and Kevin

Bilwin ("Special Agent Weatherholtz" and "Special Agent Bilwin") were special agents reporting through ASAC Blye to Taylor.

Code § 4.1-105 vests ABC special agents with police powers. On March 24, 2015, the Governor of Virginia issued Executive Order 40 to improve the law enforcement training of ABC's special agents. Executive Order 40 provides, in part, that "[t]he ABC Board shall require the immediate retraining of all ABC special agents in the areas of use of force, cultural diversity, effective interaction with youth, and community policing, to be completed no later than September 1, 2015."

On June 1, 2015 and June 2, 2015, Taylor participated in training in accordance with Executive Order 40. Taylor's training addressed several work-related topics, including "Upholding Constitutional Rights of Citizens." In part, the training defined "search" and "seizure" as each term pertains to government actions regulated by the Fourth Amendment. The training also defined and properly conceptualized "probable cause" and "reasonable suspicion" pursuant to the Fourth Amendment.

On January 24, 2017, Taylor spoke with ASAC Blye and Special Agent Weatherholtz regarding a possible illegal gambling case at the Stephens City Moose Lodge ("Lodge"), a private, members-only establishment and ABC licensee. Special Agent Bilwin, a member of the Lodge, had an identification card that allowed him to enter the establishment. The identification card did not show Special Agent Bilwin's picture. Taylor subsequently approved a plan to have Special Agent Weatherholtz enter the Lodge using Special Agent Bilwin's identification card.

On January 27, 2017, Special Agent Weatherholtz and another ABC agent made an "internal observation" of the Lodge. Both agents were admitted to the Lodge using Special Agent Bilwin's identification card. Special Agent Weatherholtz, posing as Special Agent Bilwin, signed in the other agent as his guest. Special Agent Weatherholtz and the other agent

proceeded to drink beer and solicit information from a bartender about the Lodge's upcoming Super Bowl party. The agents learned that for $30, they could attend the Super Bowl party, eat, drink, and participate in a "Super Bowl" board game that would pay out money from a "pool" to multiple winners. Special Agent Weatherholtz, again using Special Agent Bilwin's name, paid the $30 entry fee and received a numbered chip that corresponded to a square on the Super Bowl board. The bartender and a flyer at the Lodge both claimed that the Super Bowl board game was legal.

Later that same day, Special Agent Weatherholtz met with Special Agent Bilwin. Subsequently, on January 31, 2017, Special Agent Bilwin met with Taylor and ASAC Blye to discuss the Super Bowl board game. Taylor and ASAC Blye concluded that the game was illegal. Taylor then instructed Special Agent Bilwin to seize the money involved with the game as evidence. Taylor did not obtain a search warrant or instruct Special Agent Bilwin to do so. Further, Taylor did not speak with ABC's internal legal counsel or instruct Special Agent Bilwin to use ABC's consent to search form.

On February 1, 2017, Special Agent Bilwin went to the Lodge to discuss the Super Bowl board game and pool being conducted inside the premises. There, Special Agent Bilwin met with Larry Dillow ("Dillow"), the Lodge's ABC manager and bartender. Special Agent Bilwin explained the reason for his visit and asked to see the Super Bowl board game. Dillow agreed and showed Special Agent Bilwin the Super Bowl board with squares, "located in plain view behind the bar." Special Agent Bilwin then asked about the location of the numbered chips for purchase, which Dillow retrieved from a back room.

Special Agent Bilwin called Taylor to provide an update. During the phone call, Special Agent Bilwin told Taylor that he was unsure whether the game was illegal. Taylor then

informed Special Agent Bilwin that he would "get the name" of someone "at gaming" to call Special Agent Bilwin.

Approximately twenty minutes later, James Habel ("Habel"), the Lodge's administrator, arrived at the Lodge with Gail Teft ("Teft"), the Lodge's acting secretary. Special Agent Bilwin showed his credentials to Habel and Teft and explained his reason for the visit. Teft, being familiar with the Super Bowl board game, provided Special Agent Bilwin with two copies of invoices for the purchase of the boards, which were purchased from a distributor in another state.

Taylor called Special Agent Bilwin and provided him with the name of Michael Menefee ("Menefee"), a compliance manager with the Virginia Department of Agriculture and Consumer Services. Taylor told Special Agent Bilwin that Menefee would call him in thirty minutes. Taylor also reminded Special Agent Bilwin to seize the money collected by the Lodge if Menefee concluded that the Super Bowl board game was illegal.

After waiting approximately forty-five minutes, Special Agent Bilwin called Menefee. During their conversation, Menefee asked Special Agent Bilwin to send him pictures of the Super Bowl board and numbered chips. Menefee subsequently concluded that the game was illegal. Special Agent Bilwin explained the Super Bowl board game's illegality to Habel and Teft. He then informed Habel and Teft that he "would like to seize the game and proceeds as evidence." Habel and Teft complied with Special Agent Bilwin's request and "volunteered the money acquired from the game[,]" as well as the Super Bowl board, the remaining numbered chips, and three unopened Super Bowl boards. Retrieving some of those items, including a portion of the money collected, required Habel and Teft to open a safe in the Lodge's social quarters, as well as a second safe in an upstairs office. Teft organized and counted the money acquired from the game, which totaled $1,636.

ABC conducted an internal investigation and, on July 24, 2017, issued Taylor a Group III written notice with removal. As part of the investigation, an ABC investigator spoke with Habel. Habel informed the investigator that it was his understanding that Special Agent Bilwin was asked to confiscate the Super Bowl board, "as well as all cash that was made from the board." Habel also stated that he informed Special Agent Bilwin that he would "give him anything and everything that he needed." Habel "wanted to cooperate in any way that [he] could." The ABC investigator also spoke with Teft, who added that Special Agent Bilwin informed her that "he was going to have to confiscate the board and the items that went with it and the cash that went with it." Teft added that "[t]he way [Special Agent Bilwin] put it basically he didn't have a choice . . . this was what he needed to do was to confiscate it all[.]"

Based upon these facts, the hearing officer found that ABC presented sufficient evidence to show that Taylor failed to follow agency policy, which constituted a "Group II" offense. Notably, the hearing officer found that multiple "General Orders" defined the parameters of an investigation of an ABC licensee. General Order 301, for example, governs search warrants and provides that ABC special agents "shall observe constitutional guidelines when conducting searches and always remain mindful of their lawful purpose." Further, General Order 501 governs licensee inspections and provides that ABC special agents "shall not" conduct inspections when an agent possesses "advanced knowledge/probable cause that the evidence of a criminal violation is located upon the licensed premises. In this instance, the agent will obtain and execute a search warrant in accordance with General Order 301, Search Warrants." Finally, the hearing officer cited General Order 106, which addresses the issuance of lawful orders. That order provides that "Bureau supervisors will not knowingly or willfully issue any order in violation of a law, ordinance, rule or order of the United States, Commonwealth of Virginia, or the Bureau of Law Enforcement."

Mindful of these General Orders, the hearing officer found that Taylor had "advance knowledge" of a criminal violation occurring on the Lodge's premises. The hearing officer subsequently found that, pursuant to General Order 301, Taylor "was obligated . . . to 'observe constitutional guidelines when conducting searches.'" Pursuant to General Order 501, Taylor was also obligated "to refrain from conducting an inspection of the Lodge" and required to "obtain a search warrant and then execute the search warrant in accordance with General Order 301." Thereafter, the hearing officer found that Taylor failed to obtain a required search warrant before authorizing a search of the Lodge. The hearing officer also found that Taylor ordered Special Agent Bilwin to seize the money collected by the Lodge for the illegal Super Bowl board game without obtaining a search warrant first. Therefore, the hearing officer concluded that Taylor's order violated the law and ABC policy, which justified the issuance of a Group II written notice.

The hearing officer subsequently found that, given the circumstances of the case, Taylor's misconduct justified ABC's decision to elevate Taylor's Group II written notice to a Group III written notice. The hearing officer explained that, in certain extreme circumstances, a Group II offense may be elevated to a more severe Group III offense. As stated by the hearing officer, "[f]ailure to comply with search policies and laws created a unique impact on the Agency that would justify elevation of a Group II Written Notice to a Group III Written Notice." Taylor did not comply with agency policy because he did not obtain or instruct Special Agent Bilwin to obtain a search warrant before entering the Lodge or seizing its property. Consequently, the hearing officer found that Special Agent Bilwin's seizure of the Lodge's property without a search warrant describing the items to be seized "was contrary to the Fourth Amendment."[3]

---

[3] Taylor did not dispute at oral argument that, according to the hearing officer's opinion, his violation of ABC policy warranted a Group II offense.

The hearing officer also found that no exception to the Fourth Amendment's prohibition on warrantless searches and seizures justified Special Agent Bilwin's seizure of the Lodge's property. For example, the hearing officer found that not all the items seized were in plain view, particularly some of the items retrieved from the Lodge's safes. Finally, the hearing officer concluded that Habel and Teft did not consent to the search or seizure. Mindful of these circumstances and Taylor's failure to comply with search and seizure policies and laws, the hearing officer upheld Taylor's Group III written notice.

Taylor subsequently requested that EEDR administratively review the hearing officer's decision. Taylor also sought to present newly discovered evidence in the form of witness testimony from Special Agent Bilwin, who declined to testify during Taylor's hearing on the advice of his legal counsel. On March 12, 2018, EEDR issued a ruling upholding Taylor's termination and refusing to disturb the hearing officer's decision.

After exhausting his administrative appeals, Taylor appealed to the circuit court. In an opinion dated August 8, 2018, the circuit court found "that the decision of the hearing officer was not contrary to law, and there was no constitutional provision, statu[t]e, regulation or judicial decision which the hearing officer's decision contradicted." Accordingly, the circuit court denied Taylor's appeal.[4] This appeal follows.

## II. ANALYSIS

### A. Standard of Review

"[I]n conjunction with the Virginia Personnel Act, Code § 2.2-2900 *et seq[.]*, the General Assembly established a system for handling state employee complaints arising in the workplace by enacting the State Grievance Procedure[.]" Murphy v. Va. Dep't of State Police, 68 Va. App. 716, 719 (2018) (quoting Pound v. Dep't of Game & Inland Fisheries, 40 Va. App. 59, 63-64

---

[4] Taylor also filed a motion for reconsideration, which the circuit court denied.

(2003)); see also Code § 2.2-3000 et seq. Accordingly, we observe that Virginia's employee grievance procedure creates a "tripartite review procedure" with the following roles: "(1) the hearing officer is the finder of fact and final authority on factfinding; (2) DHRM and [E]EDR determine whether the hearing officer's ruling is in compliance with personnel policy and grievance procedure respectively; and (3) the courts determine whether the grievance determination is 'contradictory to law.'" Passaro v. Va. Dep't of State Police, 67 Va. App. 357, 367 (2017) (citing Va. Dep't of State Police v. Barton, 39 Va. App. 439, 445 (2002)). "Pursuant to that review procedure, the hearing officer's findings of fact and the administrative determinations of compliance with grievance procedure by [E]EDR and personnel policy by DHRM are not subject to judicial review." Id. (citing Barton, 39 Va. App. at 445).

"In determining whether a grievance decision was 'contradictory to law,' [t]he courts are limited to ascertaining compliance with constitutional provisions, statutes, regulations, and judicial decisions." Murphy, 68 Va. App. at 720 (some internal quotation marks and citations omitted). Further, it is the appealing party's burden to "identify [a] constitutional provision, statute, regulation or judicial decision which the [hearing officer's] decision contradicted.'" Osburn, 295 Va. at 17 (quoting Va. Polytechnic Inst. & State Univ. v. Quesenberry, 277 Va. 420, 429 (2009)). "Questions regarding whether a decision is contradictory to law, including the meaning of any underlying statutes, are reviewed de novo." Id. (citing Quesenberry, 277 Va. at 429; REVI, LLC v. Chicago Title Ins. Co., 290 Va. 203, 208 (2015)).

## B. Taylor's ABC Policy Violations

As a preliminary matter, this Court must address ABC's contention that this Court need not analyze the alleged Fourth Amendment issues because ABC terminated Taylor for both a violation of the Fourth Amendment as well as multiple violations of ABC policy. ABC argues that Taylor's failure to follow ABC policy, standing alone, constituted misconduct justifying

- 10 -

Taylor's removal. ABC also notes that these policies—General Orders 301, 501, and 106—impose stricter requirements upon ABC special agents than the Fourth Amendment. Therefore, ABC seems to argue that this Court should affirm the circuit court's judgment based upon Taylor's violation of ABC policy alone, because this Court is prohibited from reviewing matters of agency policy.

ABC's argument on this matter fails for two reasons. First, the hearing officer initially determined that Taylor's failure to follow ABC policy warranted a Group II offense. More specifically, the hearing officer found that given the circumstances of this case, General Orders 501, 301, and 106 obligated Taylor to obtain a search warrant before ordering a search of the Lodge and the seizure of its property. Agency policy also mandated that Taylor avoid knowingly or willfully issuing any order in violation of a law, ordinance, rule or order of the United States, the Commonwealth, or the Bureau of Law Enforcement. The hearing officer subsequently found that Taylor's actions violated ABC policy, which justified the issuance of a Group II written notice. Only after concluding that Taylor violated ABC policy did the hearing officer address the elevation of Taylor's Group II offense to a Group III offense. Given that only Group III offenses warrant termination pursuant to DHRM's Procedures Manual, it is clear that Taylor's failure to follow ABC policy alone was not sufficient misconduct to justify Taylor's removal as ABC claims, and the hearing officer did not treat Taylor's failure as such.

Second, while ABC correctly notes that agency policy is not subject to judicial review, ABC's preliminary argument fails to recognize that the policies referenced in Taylor's notice of termination are directly related to, and dependent upon, the Fourth Amendment rights of ABC applicants and licensees. This is evident in the hearing officer's opinion where the hearing officer aptly summarized the interplay between the Fourth Amendment and General Orders 501, 301, and 106 to address the elevation of Taylor's Group II offense to a Group III offense. Thus,

- 11 -

to allow the termination of Taylor's employment to depend upon ABC policy alone would amount to allowing an agency official to interpret and define the limits of the Fourth Amendment. Therefore, we must review Taylor's assignments of error regarding ABC's policies and the jurisprudence interpreting the Fourth Amendment.[5]

## C. Taylor's Standing Arguments

As a second preliminary matter, Taylor oddly argues that the circuit court erred in upholding his termination because ABC lacked standing to assert a Fourth Amendment violation on behalf of the Lodge. In support of this argument, Taylor cites a laundry list of criminal cases to assert that Fourth Amendment rights are personal rights that may not be vicariously asserted. Taylor also posits that neither the Lodge's "employees" nor its "corporate officers" had standing to assert a Fourth Amendment violation against Taylor, on behalf of the Lodge. These arguments lack merit of any kind.

The issue of standing to seek a constitutional remedy is entirely immaterial to whether Taylor violated the Lodge's Fourth Amendment rights in the abstract. Taylor's argument mixes apples and oranges. ABC was not attempting to vicariously seek redress for a violation of the constitutional rights of a third party. This appeal does not concern a criminal case in which a defendant sought to suppress evidence seized in violation of the Fourth Amendment. Rather, this case is a civil employment grievance appeal where ABC and the hearing officer determined that Taylor violated ABC policies, which incorporate by reference ABC licensees' constitutional

---

[5] In his first assignment of error, Taylor employs this same analysis to argue that the circuit court erred in upholding Taylor's termination because ABC incorporated Fourth Amendment principles in its policies. Such an action, clearly, is not automatically an error of law as Taylor seems to assert. Rather, this Court must review ABC's incorporation of the Fourth Amendment in its policies to ensure that the agency policies comply with established constitutional guidelines. See Passaro, 67 Va. App. at 367 (emphasizing that, pursuant to Virginia's employee grievance procedure, the courts only review issues of law).

protections provided by the Fourth Amendment. Therefore, Taylor's standing argument is inapplicable to the issues before us.

### D. Taylor's Fourth Amendment Arguments

Taylor argues that the circuit court erred in upholding his termination because he did not violate the Lodge's Fourth Amendment rights. Taylor supports that argument and attempts to justify his actions by relying upon numerous exceptions to the Fourth Amendment's prohibition on warrantless searches and seizures. These exceptions, as argued by Taylor, include the highly regulated industry exception, plain view, exigent circumstances, and consent.[6]

### 1. The Highly Regulated Industry Exception

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. amend. IV. It also provides that "no Warrants shall issue, but upon probable cause[.]" Id. Based on this constitutional text, the United States Supreme Court "has repeatedly held that 'searches conducted outside the judicial process, without prior approval by [a] judge or [a] magistrate [judge], are *per se* unreasonable . . . subject only to a few specifically established and well-delineated exceptions.'" City of L.A. v. Patel, 135 S. Ct. 2443, 2452 (2015) (citations omitted).

"'[T]he Fourth Amendment's prohibition on unreasonable searches and seizures is applicable to commercial premises, as well as to private homes.'" Osburn, 295 Va. at 17 (quoting New York v. Burger, 482 U.S. 691, 699 (1987)). "Warrantless searches, in either

---

[6] Taylor also makes a brief "reasonableness" argument on appeal. We recognize that the United States Supreme Court has long held that the "[t]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'" Kentucky v. King, 563 U.S. 452, 459 (2011) (quoting Brigham City v. Stuart, 547 U.S. 398, 403 (2006)). We also recognize that an action is "reasonable" under the Fourth Amendment, regardless of the individual police officer's state of mind, "'as long as the circumstances, viewed *objectively,* justify [the] action.'" Stuart, 547 U.S. at 403 (quoting Scott v. United States, 436 U.S. 128, 138 (1978) (emphasis in original)).

context, are presumptively unreasonable." Id. (citing Patel, 135 S. Ct. at 2452). "There is an exception, however, for warrantless inspections of businesses engaged in highly regulated industries." Id. (citing Patel, 135 S. Ct. at 2454-56; Burger, 482 U.S. at 702). The liquor industry falls within the highly regulated industry exception to the warrant requirement. See Colonnade Catering Corp. v. United States, 397 U.S. 72, 76 (1970).

"The highly regulated industry exception is premised upon the concept that '[c]ertain industries have such a history of government oversight that no reasonable expectation of privacy could exist for a proprietor over the stock of such an enterprise.'" Osburn, 295 Va. at 17-18 (quoting Marshall v. Barlow's, Inc., 436 U.S. 307, 313 (1978)). To be "reasonable," however, a warrantless search or seizure of a highly regulated business must be specifically authorized by statute, and the parameters of any exception to the search warrant requirement must be found in the statute. See id. at 18 (citing United States v. Biswell, 406 U.S. 311, 315 (1972)).

In the Commonwealth, Code § 4.1-204(F) grants ABC and its special agents the authority to *search* the premises of licensees. That statute states, in pertinent part, that

> [ABC] and its special agents shall be allowed free access during reasonable hours to every place in the Commonwealth and to the premises of both (i) every wine shipper licensee and beer shipper licensee and (ii) every delivery permittee wherever located where alcoholic beverages are manufactured, bottled, stored, offered for sale or sold, for the purpose of examining and inspecting such place and all records, invoices and accounts therein.

Code § 4.1-204(F). General Order 501, in turn, interprets and defines the scope of authority granted by Code § 4.1-204(F). Section IV(A) of that general order defines the scope of such inspections to include the following:

> 4. Evidence of violation of state and federal criminal laws which could constitute grounds for suspension or revocation of a license pursuant to Virginia Code Section 4.1-225. These will include, but not be limited to, the following:
>
> . . . .

- 14 -

c. Gambling violations;

. . . .

5. Agents can inspect the premises where the items outlined above could reasonably be located. While conducting inspections agents may seize items of evidence, under the plain view doctrine, of criminal violations if they have probable cause to believe such items constitute evidence of a crime. Upon seizing any such item however, the inspection should cease with the scene secured, and either a search warrant or consent to search from a person authorized to provide consent should be obtained.

In short, Code § 4.1-204(F), when read in conjunction with ABC policies, permits warrantless inspections or searches of any licensee's premises for the purpose of inspecting records and accounts. It also permits the seizure of any contraband or evidence of criminal activity in "plain view," but no other seizures without a search warrant or consent are authorized by ABC policies implementing the statute.

Here, Taylor argues that the circuit court erred in upholding his termination because Special Agent Bilwin's "entry," as characterized by Taylor, fell under the highly regulated industry exception to the Fourth Amendment. Taylor, however, offers only a recitation of the parameters of the highly regulated industry exception, but no analysis on the matter. Taylor then proceeds to argue that Special Agent Bilwin's search and subsequent seizure of the Lodge's property was "reasonable" under the circumstances.

Reviewing the ABC policies at issue in conjunction with applicable Fourth Amendment jurisprudence, we find Taylor's highly regulated industry exception argument unpersuasive. As recognized by the hearing officer, "[ABC] did not discipline [Taylor] for an unlawful *search*." (Emphasis added). Rather, Taylor was disciplined for ordering the unlawful *seizure* of money and other property belonging to the Lodge. Further, as previously mentioned, this case is not dependent upon whether Taylor violated an ABC licensee's constitutional rights in the abstract. It is instead dependent upon whether Taylor's actions violated ABC policy, which incorporates

- 15 -

guidelines pertaining to unlawful searches and seizures that are, in some respects, more restrictive than constitutional jurisprudence would otherwise permit. See Virginia v. Moore, 553 U.S. 164, 174 (2008) ("A State is free to prefer one search-and-seizure policy among the range of constitutionally permissible options, but its choice of a more restrictive option does not render the less restrictive ones unreasonable, and hence unconstitutional."). Consequently, we cannot say that either the hearing officer or circuit court's judgment on the issue was contradictory to law.

### 2. The Plain View Exception

Taylor next argues that he did not violate the Lodge's Fourth Amendment rights when he ordered Special Agent Bilwin to seize money and other property belonging to the Lodge because the seized items were in plain view. According to Taylor, Special Agent Bilwin viewed the Super Bowl board game and associated numbered chips in plain view, "the incriminating character of the evidence was plainly apparent, and [Special] Agent Bilwin had a lawful right of access to the objects themselves." Taylor also argues that probable cause supported the warrantless seizure.

"The theory of the plain view doctrine is that an individual has no reasonable expectation of privacy in items that are in plain view." Daniels v. Commonwealth, 69 Va. App. 422, 435 (2018) (quoting Commonwealth v. Thornton, 24 Va. App. 478, 483 (1997)). The United States Supreme Court has identified the following three requirements that must be met before the plain view doctrine applies: "1) that the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed, 2) that the incriminating character of the evidence must be immediately apparent, and 3) that the officer have a lawful right of access to the object itself." Id. (quoting Cauls v. Commonwealth, 55 Va. App. 90, 99 (2009)). Only when these requirements are met can the plain view doctrine justify a warrantless seizure.

Here, this Court need not individually analyze each requirement of the plain view doctrine because the hearing officer found as a matter of fact that only some, but not all, of the items seized by Special Agent Bilwin were in plain view. "The [Super Bowl boards] and chips were on display for anyone in the Lodge to see." Importantly, however, the hearing officer found that "[n]ot all of the money . . . was in plain view. Some of the money was in a cash bag in a safe in the social quarters and some of the money was in a safe in the office." With the record clearly supporting these findings of fact, the hearing officer correctly concluded that "[b]ecause some of the money was not in plain view, not all of the money could be seized without a warrant." Consequently, we cannot say that either the hearing officer or circuit court's judgment on the issue was contradictory to law.

### 3. The Exigent Circumstances Exception

Taylor also argues that "exigent circumstances inside the Lodge" justified Special Agent Bilwin's seizure of the money associated with the Super Bowl boards. Similar to his highly regulated industry exception argument, however, Taylor offers only a brief recitation of the law of exigent circumstances, but little to no analysis.

"The exigent circumstances exception to the warrant requirement applies when the exigencies of the situation make the needs of law enforcement so compelling that [a] warrantless search [or seizure] is objectively reasonable under the Fourth Amendment." Commonwealth v. Campbell, 294 Va. 486, 493 (2017) (quoting Kentucky v. King, 563 U.S. 452, 459 (2011) (some internal quotation marks omitted)), cert. denied sub nom. Campbell v. Virginia, 139 S. Ct. 421 (2018). According to our Supreme Court, the factors relevant to an exigent circumstances analysis include, but are not limited to, the following:

> (1) the degree of urgency involved and the time required to get a warrant; (2) the officers' reasonable belief that contraband is about to be removed or destroyed; (3) the possibility of danger to others, including police officers left to guard the site; (4) information that

> the possessors of the contraband are aware that the police may be on their trail; (5) whether the offense is serious, or involves violence; (6) whether officers reasonably believe the suspects are armed; (7) whether there is, at the time of entry, a clear showing of probable cause; (8) whether the officers have strong reason to believe the suspects are actually present in the premises; (9) the likelihood of escape if the suspects are not swiftly apprehended; and (10) the suspects' recent entry into the premises after hot pursuit.

Id. at 495 (quoting Verez v. Commonwealth, 230 Va. 405, 410-11 (1985)).

The hearing officer and the circuit court found Taylor's exigent circumstances argument unpersuasive as do we. In his decision, the hearing officer explained that "[a]lthough money is inherently mobile and easily concealed," no exigency existed independent of Taylor's instruction to Special Agent Bilwin to seize the money. The hearing officer added that Taylor "could have obtained a search warrant to avoid the exigency or "'frozen the scene' until he was able to obtain a search warrant." We agree.

Nothing in the record supports the existence of any exigency requiring Special Agent Bilwin's warrantless seizure of the Lodge's property. The record reflects that Taylor knew of the Super Bowl board game's illegality several days before Special Agent Bilwin's visit to the Lodge on February 1, 2017. Taylor also ordered the warrantless seizure of the gambling proceeds on January 31, 2017, the day before the seizures occurred. Additionally, the record does not reflect that the evidence related to the Super Bowl board game was in jeopardy of being lost, destroyed, or removed from the Lodge when Taylor ordered the warrantless seizures. Both Teft and Habel cooperated with Special Agent Bilwin's investigation and informed him of their intent to comply. Finally, this Court cannot conclude that any of the other "Verez" factors, which generally apply to more serious criminal offenses, apply here. Therefore, we cannot say that the hearing officer's conclusion that the exigent circumstances exception did not apply was contradictory to law.

## 4. The Consent Exception

In his final Fourth Amendment argument, Taylor argues that the circuit court erred in upholding his termination because Special Agent Bilwin obtained consent from Teft and Habel to seize the money associated with the Super Bowl board game.

"Where consent is freely and voluntarily given, probable cause and a search warrant are not required." Limonja v. Commonwealth, 8 Va. App. 532, 540 (1989). "Whether a person has consented to a warrantless search 'is a factual question best answered by the . . . factfinder.'" Osburn, 295 Va. at 20 (quoting Evans v. Commonwealth, 290 Va. 277, 283 n.4 (2015)). "Pursuant to Virginia's statutory grievance procedure, findings of fact are to be made by the hearing officer." Id.; see also Code § 2.2-3005.1(C).

Here, the hearing officer found that Habel and Teft did not consent to Special Agent Bilwin's seizure of the money at issue. That factual finding is supported by the record. There is no evidence in the record of an affirmative consent to seize the items taken. The hearing officer explained that Habel and Teft's expressed desire to cooperate with Special Agent Bilwin did not mean that they consented to the seizure of the money. The hearing officer also noted that Special Agent Bilwin did not inform Habel and Teft that they could refuse to turn over the money. Finally, while ABC created a consent to search form to resolve questions of whether a licensee consented to a search or seizure, Special Agent Bilwin never presented Habel or Teft with such a form. It follows that we cannot say that either the hearing officer or circuit court's judgment on the issue was contradictory to law.

## E. Taylor's Due Process Argument

In his final assignment of error, Taylor argues that the circuit court erred in upholding his termination because ABC "failed to follow its own internal policies" and "departed from fair and unprejudiced discipline." Taylor also accuses ABC of terminating him in a "retaliatory and

unlawful" manner, which violated his due process rights. Taylor attempts to absolve himself of responsibility by asserting that, at the time of the investigation into the Lodge's activities, he was not Special Agent Bilwin's "line supervisor." Taylor also claims that he was "unaware of many details of [Special] Agent Bilwin's investigation at the time [he] was questioned regarding [Special] Agent Bilwin's handling of the gambling investigation." While Taylor maintains that ABC failed to take these factors into consideration before issuing him a Group III written notice, he fails to explain why ABC's decision to terminate his employment was retaliatory and unlawful.

We find that Taylor's final assignment of error is without merit. "Under settled principles, a state employee with a property interest in his employment is entitled to pre-termination 'oral or written notice of the charges, an explanation of the employer's evidence, and an opportunity for the employee to tell his side of the story.'" Va. Dep't of Alcoholic Beverage Control v. Tyson, 63 Va. App. 417, 423-24 (2014) (quoting Gilbert v. Homar, 520 U.S. 924, 929 (1997)). This Court has concluded, however, that "[t]he 'elaborate statutory grievance procedures' required by the State Grievance Procedure 'more than satisfy the minimal requirements of due process.'" Id. (quoting Va. Dep't of Transp. v. Stevens, 53 Va. App. 654, 664 (2009)).

In this case, ABC followed the grievance statutes at all stages of the process. It ultimately ended with an evidentiary hearing before a hearing officer in which Taylor was represented by counsel. During the hearing, Taylor had the opportunity to present evidence, call and examine witnesses, and contest all aspects of the agency's decision. Taylor then had the opportunity to request that EEDR conduct an administrative review of the hearing officer's decision. Taylor also filed an appeal with the circuit court. The circuit court ultimately found, however, that the hearing officer's decision "was not contradictory to law." It is difficult to

- 20 -

conceive how this comprehensive process violated Taylor's due process rights, and Taylor offers none beyond asserting the severity of the sanction as subjectively prejudicial and unfair. Therefore, we conclude that the State Grievance Procedure more than satisfied Taylor's due process rights.

## III.  CONCLUSION

For the foregoing reasons, we affirm the circuit court's judgment that the hearing officer's decision was not contradictory to law.

<u>Affirmed.</u>