COURT OF APPEALS OF VIRGINIA

Present:    Judges Beales, O'Brien and Russell
Argued by videoconference

CHARLES E. HAYES, JR.

MEMORANDUM OPINION[*] BY
v.        Record No. 0570-21-4            JUDGE MARY GRACE O'BRIEN
                                          JANUARY 25, 2022
VIRGINIA DEPARTMENT OF MOTOR VEHICLES

FROM THE CIRCUIT COURT OF THE CITY OF ALEXANDRIA
Kathleen M. Uston, Judge

Anthony J. Marcavage (Lee E. Berlik; BerlikLaw, LLC, on briefs),
for appellant.

Ryan S. Hardy, Assistant Attorney General (Mark R. Herring,[1]
Attorney General, on brief), for appellee.

Charles E. Hayes, Jr. ("appellant") appeals his termination from employment with the

Virginia Department of Motor Vehicles ("DMV"). His sole assignment of error challenges the

court's finding that DMV did not violate his "constitutional due process rights" by "fail[ing] to

inform him that he was under investigation."

BACKGROUND

Appellant, who had been employed by DMV for approximately thirty-two years, was the

office manager at the Alexandria DMV customer service center ("the CSC"). His responsibilities

included hiring, training, and mentoring employees, ensuring "effective delivery of customer

service operations," and complying with "all state, federal, and Motor Vehicle Code of Virginia[]

rules, policies, and procedures." He was responsible for managing customer service center

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] Jason S. Miyares succeeded Mark R. Herring as Attorney General on January 15, 2022.

functions related to "facilities, staff, services, safety, security, assets, information, and finances . . . in accordance with statutory and agency administrative rules, regulations, and procedures."

In December 2019, the CSC was undergoing renovations. The building was vacant, and no employees were scheduled to work during the renovations. On December 13, a demolition contractor reported to a DMV deputy director that five vehicles and a trailer were in the parking lot and would become a "major issue" on December 16, when demolition commenced. The contractor advised that, according to a security guard, the vehicles "appear[ed] to have been abandoned for months." Two of the vehicles did not have license plates.

When asked about the cars, appellant told two DMV managers that four of the vehicles belonged to residents of an adjacent apartment complex and he would ask them to move their cars.[2] On December 16, appellant represented that he had asked these owners to move their vehicles.

Agent Ryan Woods, of DMV's law enforcement division, was assigned to investigate the four vehicles. Agent Woods discovered that the residents of the adjacent apartment complex did not, in fact, own any of the cars. Appellant owned two of them, a Nissan Altima and an Infiniti G35. The other cars, an Oldsmobile Cutlass and a Toyota Sequoia, belonged to two of appellant's acquaintances — the owner of an auto repair shop, José Velasquez, and the shop's mechanic, Luis Orellana.

The Nissan had no license plates and was titled to appellant on June 29, 2018. The Infiniti was not titled in Virginia and had a West Virginia Ride-Away Pre-Owned Auto sales placard in lieu of a license plate. The Oldsmobile had an "inactive" title on file; the license plate had expired in April 2015. The Toyota's license plate had expired in June 2019, and the decal on the plate had been issued to a completely different vehicle.

---

[2] The fifth vehicle was owned by a DMV employee who was generally permitted to park there while commuting by public transport to another CSC, and the trailer belonged to DMV.

DMV supervisors became concerned that appellant was selling cars on DMV property. Specifically, the demolition contractor reported that a person came to the construction site and asked for appellant by name "to inquire about purchasing one of the vehicles parked in the lot."

In an interview with Agent Woods on December 18, 2019, appellant acknowledged that he put a West Virginia Ride-Away sales placard on the Infiniti but had not bought the car in West Virginia. Appellant initially stated that he did not remember where he bought the vehicle, but he then told Agent Woods that he purchased it directly from the prior owner. When Agent Woods advised that the Infiniti's prior owner denied personally selling the car to appellant, appellant admitted that he purchased it through Velasquez, his acquaintance who owned the auto repair shop. Appellant told Agent Woods that the Infiniti had been in the DMV parking lot for "maybe a couple of weeks" because he "had to have the engine done and . . . get tags for it."

Appellant also explained to Agent Woods that he kept the Nissan in the DMV parking lot while it "went through the state inspection" and he was "getting ready to take it back to Maryland," where he lived. However, further investigation revealed that both cars had been in the DMV parking lot for months.

Agent Woods determined that although no criminal activity occurred, appellant apparently drove his vehicles without proper registration, repeatedly using one-way trip permits.[3] Appellant did not log the trip permits as required and used them to drive his cars back and forth between work and home. Agent Woods also noted that appellant "was not being honest about the vehicles in the parking lot belonging to residents of the apartment complex."

---

[3] Code § 46.2-651 authorizes DMV to issue a "trip permit" to the owner of an unregistered car that is "valid for three days" and allows only one-way travel between a specific "beginning point and the point of destination." DMV protocols require employees to document each permit in a "Friends and Family" log.

DMV customer service managers were also investigating appellant. When appellant purchased the Nissan on April 4, 2018, he instructed one of his subordinates to remove a hold on the car's title, in violation of DMV policy. The subordinate followed appellant's instructions and was severely disciplined as a result. The investigators also discovered that appellant accessed DMV records multiple times without legitimate business reasons. In February and March 2018, appellant improperly accessed vehicle records of the Nissan's prior owner. He also improperly accessed vehicle records of both Orellana and Velasquez's auto repair shop. Further, he improperly accessed the driving record of a former DMV assistant manager.

On January 6, 2020, DMV agents reinterviewed appellant, who admitted that he drove the Infiniti between the CSC and his home in Maryland in violation of his one-way trip permits. Appellant, who initially denied knowing how the West Virginia placard came to be on his Infiniti and later suggested that it came from the CSC, now told the investigators that a repair shop in Baltimore placed the placard on his car when he took it in for repairs. Appellant also admitted driving the Infiniti "a couple of times" with either the West Virginia placard or an expired trip permit.

Pursuant to the Department of Human Resource Management's ("DHRM") Standards of Conduct, DMV sent appellant a formal "Request for Response." The letter informed appellant of his due process rights under the Standards of Conduct, including the right "to be informed of any concerns regarding possible poor performance or misconduct prior to the agency taking any disciplinary action" and the right "to respond to such concerns before action is taken." The letter advised that DMV had not determined if it would impose disciplinary action, but "that outcome remains a possibility," and therefore appellant was being given the "opportunity to provide" an explanation for his actions "including, but not limited to, any mitigating circumstances." The letter

- 4 -

summarized appellant's statements from the investigatory interviews and specifically referenced the lack of documentation for the multiple times he accessed DMV records.

Appellant's response included a denial that he ever admitted driving the Infiniti with a West Virginia placard. He also stated that his "vehicles were never operated . . . without a trip permit or a license plate," and he denied improperly accessing DMV records.

DMV issued three Group III written notices of termination to appellant.[4] The first notice advised that appellant had violated multiple DMV laws and regulations relating to his position as a CSC manager. DMV referred to appellant's statements that he "admitted to driving [his] car from [his] home to the Alexandria CSC without a Trip Permit or a registration, using the West Virginia placard as a surrogate for a vehicle license[,] . . . and driving [his] vehicles on expired Trip Permits on 'a couple' of occasions."

The second notice stated that appellant accessed records of several individuals without a legitimate business reason, improperly directed an employee to remove a title stop from the Nissan that he purchased on April 4, 2018, and failed to log multiple trip permits as required. Appellant's status as a supervisor elevated the severity of these policy violations.

The third notice stated that appellant made false and misleading statements to law enforcement and management, which was "the most troubling misconduct." The notice cited examples of appellant's contradictory statements and concluded that he had been "intentionally deceptive and evasive." Each written notice provided that it "independently carri[ed] with it termination of employment."

---

[4] DHRM's Policies and Procedures Manual, which sets forth the Standards of Conduct, describes levels of offenses ranging from the lowest level, "Group I," to the highest level, "Group III." Group III offenses include acts that "constitute illegal or unethical conduct; neglect of duty; . . . or other serious violations of policies, procedures, or laws." DHRM Policies and Procedures, Standards of Conduct: Policy 1.60 (Apr. 16, 2008).

Appellant filed a grievance on March 13, 2020, pursuant to the State Grievance Procedure, Code §§ 2.2-3000 to -3008. A hearing officer upheld each written notice and affirmed the termination decision.

Appellant appealed to DHRM's Office of Employment Dispute Resolution ("EDR"), which determined that the disciplinary actions were "consistent with law and policy." EDR thus "decline[d] to disturb the hearing officer's decision."

In an appeal to circuit court, appellant claimed that DMV violated his constitutional due process rights when special agents interviewed him without notifying him that he was the subject of the investigation in violation of state policy and that the subsequent notice was inadequate to remedy that violation. The court ruled that the hearing officer's decision was not "contradictory to law" under Code § 2.2-3006(B) and affirmed the decision to terminate appellant's employment.

ANALYSIS

On appeal from a decision based on the State Grievance Procedure, a circuit court has authority to reverse a hearing officer's decision only if it is "contradictory to law." Code § 2.2-3006(B). We apply the same standard of review. *See Va. Dep't of Corr. v. Compton*, 47 Va. App. 202, 219 (2005); *see also Pound v. Dep't of Game and Inland Fisheries*, 40 Va. App. 59, 64 (2003).

"In determining whether a grievance decision was 'contradictory to law,' [t]he courts are limited to ascertaining compliance with constitutional provisions, statutes, regulations, and judicial decisions." *Taylor v. Va. Alcoholic Beverage Control Auth.*, 70 Va. App. 237, 253 (2019) (alteration in original) (quoting *Murphy v. Va. State Police*, 68 Va. App. 716, 720 (2018)). "Questions regarding whether a decision is contradictory to law . . . are reviewed *de novo*." *Id.* (quoting *Osburn v. Va. Dep't of Alcoholic Beverage Control*, 295 Va. 10, 17 (2018)).

"This Court is bound by the hearing officer's factual findings." *Id.* at 246; *see also id.* at 253 (describing the hearing officer as the "final authority on factfinding" (quoting *Passaro v. Va. Dep't of State Police*, 67 Va. App. 357, 367 (2017))); *Va. Dep't of Transp. v. Stevens*, 53 Va. App. 654, 658 (2009) (stating that courts "review[] the facts developed in the agency record in the light most favorable to the party prevailing in that forum and defer[] to agency factfinding unless patently insubstantial").

We have recognized that, generally, "public employees are vested with a constitutionally protected property interest in continued employment." *Compton*, 47 Va. App. at 219; *see Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538-39 (1985). Further, "where a public employee has a property interest in continued employment, that employment may not be terminated without adequate procedural safeguards." *Compton*, 47 Va. App. at 220.

Procedural due process requirements are satisfied when a state employer provides notice of the charges and gives the employee a meaningful opportunity to respond. *Id.* at 221; *see Loudermill*, 470 U.S. at 546; *see also McManama v. Plunk*, 250 Va. 27, 34 (1995) ("Procedural due process guarantees that a person shall have reasonable notice and opportunity to be heard before any binding order can be made affecting the person's rights to liberty or property.").

"To pass constitutional muster, the notice given 'must be of such nature as to reasonably convey the required information.'" *Compton*, 47 Va. App. at 222 (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)). "[W]hen determining the sufficiency of a given notice, courts must consider the realities of that particular case." *Id.*; *see Mullane*, 339 U.S. at 314-15.

Relying primarily on *Compton*, appellant claims that procedural due process required DMV to advise him that he was being investigated for potential charges. However, *Compton* and its precedent do not support such an expansion of the due process right. The issue in *Compton* was

- 7 -

whether a Group III termination notice, not a preliminary investigation, sufficiently advised an employee that he was being terminated for both a criminal conviction and the underlying misconduct. 47 Va. App. at 218-23. Citing *Loudermill*, 470 U.S. at 546, we stated that procedural due process required giving the employee "(1) notice of the charges against him, and (2) a meaningful opportunity to respond." *Id.* at 221. We held that due process was satisfied because a "reasonable reading" of the notice indicated that the employee knew "he was being terminated for his 'behavior' — not just his 'conviction.'" *Id.* at 223.

In *Loudermill*, the United States Supreme Court held that the due process doctrine gives a state employee the right to "oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." 470 U.S. at 546. This doctrine cannot logically apply before the employer has determined the charges against the employee or developed the very evidence it must disclose. Put differently, the notice that due process requires cannot precede acquisition of the information to be conveyed. "The duty of fair notice does not require such extraordinary and particularized foresight of the specific manner in which a [state employee] might display poor judgment meriting severe discipline." *Stevens*, 53 Va. App. at 665 (alteration in original) (quoting *Swank v. Smart*, 898 F.2d 1247, 1253 (7th Cir. 1990)).

Appellant asks this Court to recognize a new substantive right not to be fired if the state employer does not warn the employee that he is under investigation. In *Stevens,* we determined that an employee's due process right to "pre-deprivation notice of an *impending* termination decision" does not include "notice of possible grounds for a *potential* termination." *Id.* at 664-65. We stated that, by reversing the termination decision, the circuit court erroneously exceeded the "state employee's procedural right to be heard before being fired and, instead, recognize[d] a new

- 8 -

substantive right not to be fired at all if the employer does not warn the employee of each specific example of misbehavior for which the employee could be fired." *Id.* at 664.

Similarly, here, we hold that due process did not require DMV to notify appellant that he was under investigation merely because there were possible grounds for a potential termination — but not yet grounds for an impending termination. *See id.* at 664-65.

Appellant argues that the "investigatory process itself, in which he was also deprived of notice . . . that he was under investigation, deprived him of a meaningful opportunity to respond to the allegations that subsequently arose." However, DMV was still gathering facts during the interviews. To the extent appellant was terminated for his evasive and conflicting answers to investigators, he cannot blame his conduct on DMV's purported "failure" to give him advance notice that the investigative interviews could have resulted in termination.

Appellant also argues that DMV violated state policy by not informing him of the investigation and therefore he should be reinstated because this policy violation deprived him of due process. However, DHRM found no error in the hearing officer's conclusion that the disciplinary actions were consistent with state policy. We are bound by DHRM's policy interpretations. *See Va. Dep't of State Police v. Barton*, 39 Va. App. 439, 445 (2002) (stating that, even when reviewing whether a termination decision is "contradictory to law" under Code § 2.2-3006(B), courts must defer to DHRM with respect to "whether the hearing officer's decision is consistent with policy" and that determination is not "subject to judicial review").

Here, DMV satisfied the notice required by procedural due process. First, after the investigation, it issued appellant the Request for Response letter that summarized its findings. The letter identified specific concerns regarding appellant's conduct, including appellant's misleading statements to DMV personnel during the investigation, his admission that he drove vehicles without proper permits, and his repeated access of DMV records without justification. DMV expressly

informed appellant that he had the "opportunity to provide" pertinent information "including, but not limited to, any mitigating circumstances." Appellant responded, and DMV issued three Group III notices that mirrored the concerns raised in the Request for Response and addressed further contradictions, inaccuracies, and falsehoods in appellant's response. Appellant subsequently pursued his administrative-appeal and judicial-review rights under the State Grievance Procedure.

"[A] pretermination opportunity to respond, coupled with the post-termination administrative procedures[,] provides 'all the process that is due.'" *Va. Dep't of Alcoholic Beverage Control v. Tyson*, 63 Va. App. 417, 428 (2014) (quoting *Holland v. Rimmer*, 25 F.3d 1251, 1258 (4th Cir. 1994)); *see Loudermill*, 470 U.S. at 547-48. "The elaborate statutory grievance procedures more than satisfy the minimal requirements of due process." *Stevens*, 53 Va. App. at 664. Because appellant received all process that was due under the State Grievance Procedure, he is precluded from reinstatement to redress any perceived due process violations in the pre-decisional investigation. *See id.* at 665.

## CONCLUSION

For the foregoing reasons, we affirm the circuit court's judgment that the hearing officer's decision was not contradictory to law.

*Affirmed.*